J. F. NIEDERHAUSER, Appellee, v. JACKSON DAIRY COMPANY, Appellant.

No. 40649.

JUNE 20, 1931.

REHEARING DENIED OCTOBER 31, 1931.

Bryant & Bachman, for appellee.

W. D. Kearney and E. N. Farber, for appellant.

GRIMM, J.—Under the facts, it appears the plaintiff (appellee) resides on a farm adjoining Marshalltown, Iowa, and prior to November, 1928, was engaged in the distribution of milk over certain well established milk routes in the city of Marshalltown, Iowa.

The defendant (appellant) is an Iowa corporation with its principal place of business in Marshalltown, Iowa, and was also engaged in the distribution of milk to retail customers.

On November 9, 1928, the plaintiff and defendant entered into the written contract upon which this suit is based. In said contract, the plaintiff agreed to deliver to the defendant all his milk routes in Marshalltown, Iowa, by furnishing to the defendant a complete list of all of his customers, and by recommending the defendant to said customers, and the defendant in turn agreed to purchase all milk furnished by the plaintiff for a period of three years from the 15th day of November, 1928, and to pay plaintiff therefor the sum of fifty cents per hundred pounds more than was paid to other patrons for milk of the

same butterfat test. It was agreed that the milk was to be clean and sanitary and the cows were to be tuberculin tested and the plaintiff agreed not to re-enter the retail milk business for a period of three years. The plaintiff turned over his milk routes as agreed and delivered his milk to the defendant from November 15, 1928, to February 11, 1930.

On February 3, 1930, the defendant by F. R. Jackson, its president, informed the plaintiff that it would take no more of his milk because the cows had not been tuberculin tested for more than a year last past.

On February 1, 1930, Jackson had a conversation with the plaintiff, in which he asked him how long it had been since his cows were tested for tuberculosis, and the plaintiff replied: "A year ago last fall."

On February 3, 1930, Jackson had another conversation with plaintiff in which Jackson said to the plaintiff: "In view of the fact that your cows have not been tested since a year ago last fall, we are not going to take your milk any longer." In the same conversation, Jackson said: "As your *customer* we will take our milk for a few days and give you a chance to turn it and will use it in the pasteurizer and pasteurize it, all of it." (Writer's italics). It is claimed by the defendant that this was done to give the plaintiff a chance to get another outlet for his milk.

On the morning of February 11th, Jackson refused to furnish the plaintiff with empty cans in which to transport the milk and no more deliveries were made to the defendant. Thereafter, the plaintiff sold the milk to the best advantage and this suit is to recover as damages the difference between the contract price and the amount obtained for the milk.

In the meantime, the plaintiff had secured the services of one Mahlon Russell, a licensed veterinarian of Marshalltown, who began a test of the plaintiff's herd on February 3rd and completed it on February 6, 1930. According to this examination, there were at that time no "reactors" in the plaintiff's herd.

The plaintiff in his petition alleged "that the said plaintiff has fulfilled all of the terms and conditions imposed upon him by said contract and has been ready and willing at all times and

is now ready and willing to carry out the terms of said contract.''

The defendant's answer was in the nature of a general denial, with the further allegation that ''defendant's refusal to take further milk from plaintiff was because plaintiff failed to keep and perform certain terms and conditions contained in the contract between the parties, which were incumbent upon him to perform, viz.: to have his cows tuberculin tested and to deliver the milk to defendant in a clean and sanitary condition.''

The defendant further alleges that on account of plaintiff's failure to have his cows tuberculin tested, the defendant had the right to refuse to take plaintiff's milk and the defendant so refused. The defendant also pleaded an ordinance of the City of Marshalltown, providing for the inspection of milk and for tuberculin tests of herds supplying same and certain regulations of the State Department of Agriculture in relation to administering tuberculin tests to cows and herds.

The contract provides, among other things, as follows:

''Said First Party (Niederhauser, plaintiff) hereby agrees to turn over to said Second Party (Jackson Dairy Company, defendant) all of his milk business, retail and wholesale, and to *recommend* said Second Party to all of his customers to whom he sells and delivers milk and furnish to the Second Party a complete list of his customers as soon as this contract is signed.'' (Writer's italics).

After providing for the delivery of the milk, the contract provides, ''the cows to be tuberculin tested.''

The contract also contained a clause authorizing the plaintiff to terminate the contract on sixty days' notice.

The court withdrew from the jury the consideration of all questions except the amount of damages which the plaintiff might recover.

I. There is practically no dispute upon the facts in this case. It appears without conflict that the defendant first learned on February 1, 1930, that plaintiff's herd had not been tested for more than a year. It appears without dispute that on February 3, 1930, the defendant said to the plaintiff: ''In view of the fact that your cows hadn't been tested since a year ago last fall, we are not going to take your milk any longer,'' and that

at the same time the defendant said to the plaintiff: "As your customer we will take our milk for a few days and give you a chance to turn it and will use it in the pasteurizer and pasteurize it, all of it."

On February 11th, the defendant refused to furnish empty cans to the plaintiff in which to deliver the milk and refused on that day to accept any more milk from the plaintiff.

It also appears without conflict that a licensed veterinarian began examination of the plaintiff's herd on February 3rd and completed the test on February 6th and that there were then no "reactors" in the herd.

Section 3077 of the Code of 1927 is as follows:

"Purity of milk and cream. No wholesaler or retailer of milk or cream, except the producer, shall offer or expose for sale any milk or cream unless the same is produced from cows known to be free from tuberculosis, as evidenced by a certificate issued within one year by a licensed veterinarian, or unless the same shall have been pasteurized according to the established regulations of the department of agriculture."

It is undisputed that on February 3, 1930, when Jackson notified the plaintiff that the defendant elected to refuse to longer perform under the contract because of defendant's claim that plaintiff had breached the contract, that plaintiff's herd had not been tested for more than a year. It will be noted that the contract provides that the cows were to be tuberculin tested, without further specification as to how this was to be done.

Manifestly, the contract must have been made in contemplation of Section 3077 of the Code then in force, and it must be accordingly so construed.

The contract provides for the payment of fifty cents per one hundred pounds of milk by the defendant to the plaintiff, in excess of the price paid to other patrons for milk of the same butterfat test during the term of the contract.

It is fair to assume that at least one of the principal considerations for this excess of price was that the defendant might be able to advertise to the public and to its customers that it was handling milk from tuberculin tested herds.

It clearly appears from the record that very promptly after the defendant learned that the plaintiff had not complied with

the law of Iowa in reference to the testing of the plaintiff's herd, the defendant very promptly elected to not further perform under the terms of the contract, because the plaintiff had breached the contract.

We think the defendant was within its rights in so doing. The mere fact that subsequent tests of the herd disclosed that the herd was then free from tuberculosis and the fact that the plaintiff had been endeavoring to secure a test prior to the 3rd day of February, 1930, is not material. The plaintiff had breached his contract in a substantial manner and this, under the facts in this case, relieved the defendant from further performance.

The mere fact that the defendant, as a matter of generosity, offered to and did take the plaintiff's supply of milk for a few days after February 3rd did not constitute a waiver of the defendant's election. It is elemental that the effect of a breach of contract by one party is to excuse performance by the other. Elliott on Contracts, Vol. 3, Sec. 2025; Wasser v. Western Land Company, 107 N. W. 160 (Minn.); Clark on Contracts (3d Ed.) 557; Goben v. Des Moines Asphalt Co., 208 Iowa 1113; Canfield Lumber Co. v. Kint Lumber Co., 148 Iowa 207; and cases cited.

Having pleaded a fulfillment of all of the terms and conditions imposed upon him by the contract, plaintiff failed in the proof. The plaintiff's alleged performance of the condition of the contract in reference to testing his herd (a point not here decided) was after the defendant had elected not to further continue the contract by reason of the plaintiff's failure to perform. This subsequent test by the plaintiff was not available as proof of plaintiff's performance of his contract. The plaintiff having failed to prove his performance of the contract, he cannot recover damages from the defendant.

It follows that the court erred in withdrawing from the jury all of the defenses of the defendant and submitting only to the jury the question of the amount of the damages to be recovered by the plaintiff. This was equivalent to a direction by the court of a verdict in favor of the plaintiff, leaving only for consideration by the jury the amount of the damages.

It follows that the cause must be, and is,—Reversed.

FAVILLE, C. J., and STEVENS, DE GRAFF and WAGNER, JJ., concur.

KINDIG, ALBERT, MORLING and EVANS, JJ., dissent.

KINDIG, J. (dissenting)—I am dissenting in this case on the theory that the contract between Niederhauser and the Jackson Dairy Company contemplated that the milk should be taken by the latter during the term named in the contract so long as the same was duly tested. If in any interim there was not a proper test, then the Dairy Company was not required to receive the milk. But when the proper test was made, then Niederhauser could require the Dairy Company to again take the milk. Upon that basis, there was no ground for a rescission. Hence the contract at all times remained in existence, and when the Dairy Company failed to receive the milk after the test, a breach of contract arose, and Niederhauser is entitled to damages accordingly.

ALBERT, J., joins in this dissent.

MORLING, J. (dissenting)—Plaintiff owned and operated a dairy and milk route. Under date of November 9, 1928, the plaintiff as first party and defendant, a corporation, as second party, made a contract as follows:

"Said first party agrees to turn over to said second party all of his milk business, retail and wholesale, and to recommend said second party to all of his customers to whom he sells and delivers milk and furnish to the second party a complete list of his customers as soon as this contract is signed.

"Said first party further agrees to deliver to said second party at its place of business in Marshalltown, Iowa, all the milk he produces but it is understood that he is not to deliver the milk from more than sixty cows at any one time. The cows to be tubercular tested and milk to be in clean, sanitary condition and delivered daily not later than 8:30 o'clock A. M.

"Party of the first part further agrees that he will not re-enter the milk business in Marshalltown, Iowa, either wholesale or retail for a period of three years from the date of this contract; with one exception and that only upon one condition, that is, in the case the St. Thomas Hospital whose business is turned over herewith shall voluntarily and of their own account, with-

out any influence or persuasion from the party of the first part become dissatisfied with the party of the second part or the milk or service furnished by said second party and shall discontinue buying milk from said second party, then the first party may again sell milk to the St. Thomas Hospital only, and then only in case first party has not been-guilty of any persuasion or influence in the dissatisfaction of the St. Thomas Hospital with the second party.

"Party of the second part in consideration of the above obligations and each and all of them agrees to buy all of the milk produced by the party of the first part but not to exceed the production from sixty cows at any one time and agrees to pay therefor fifty cents per hundred pounds in excess of the price paid to the patrons for milk of the same butter fat test for a period of three years from the signing of this contract. Settlement to be made between the parties hereto on the 5th and 20th of each month.

"It is further understood and agreed that the first party may discontinue supplying milk to the party of the second part at any time after the giving of sixty days notice of such discontinuance."

Accordingly plaintiff turned over to defendant a complete list of his customers, sold and delivered his milk to defendant until February 11, 1930. Sold to none other. Defendant paid for all the milk thus received. Plaintiff had had a tuberculin test of his herd on August 14, 1928. Plaintiff's cows were then, and ever since have been, free from tuberculosis. Jackson, an officer of defendant, testified that on February 1, 1930, he asked plaintiff "How long it had been since his cows were tested for tuberculosis and he said 'a year ago last fall.' " On February 3, 1930, he asked plaintiff " 'Do you say that the cows haven't been tested since last fall,' and he said, 'there was some young stuff that wasn't tested then.' I said 'any of them giving milk now' and he said 'they will be pretty soon' and I said 'You will be bringing that milk to us also' and he said 'No, I don't intend to bring that.' I said, 'in view of the fact that your cows hadn't been tested since a year ago last fall, we are not going to take your milk any longer.' He said 'I have been after Dr. Householder time and again to test my cows and he always puts me off.' I says 'that isn't my lookout,' I says, 'that is up to you,'

but I says 'as your customer we will take our milk for a few days and give you a chance to turn it and will use it in the pasteurizer and pasteurize it, all of it.' That is we would give him a chance to get another outlet for his milk. Mr. Niederhauser said nothing more except that he had been trying to get Dr. Householder to test his cows and Householder had told him that it didn't make any difference because Jackson pasteurized all his milk. I told him that that didn't make any difference to me for we were sending it to St. Thomas Hospital and families who have sickness in their home and who will not use the milk any longer.'' 'Defendant took the milk until February 11th when it refused to take it longer. Plaintiff tendered milk to defendant and this suit is for damages for refusal to take it. Householder, a State milk inspector and an accredited veterinarian, testified that ''I am supposed to see that these herds pass the tests required by the city ordinance, other than the milk used through the pasteurization plan. I did not require Mr. Niederhauser to make a test prior to this spring because he was delivering milk to Jackson Dairy. Pasteurization doesn't require it to be tested. * * * I tested them (accredited herds) once a year merely for the purpose of keeping them on this accredited list.'' From February third to February 6, 1930, Russell, a veterinarian holding a certificate as such, tested plaintiff's herd found it in good health and free from tuberculosis according to the intradermic test. On February 14, 1930, a request was made of the Department of Agriculture for a test. On April 12, 1930, a test was made by a veterinarian of that department. No reactors were found. Plaintiff testifies that on February 10, 1930, he told Jackson, defendant's officer, ''I was going to keep right on bringing my milk that I figured that I hadn't done anything wrong. * * * He said he wouldn't accept it and that I had to make other arrangements.'' Jackson testified to ''Niederhauser bringing down a certificate of Dr. Householder on Thursday of the week of February 3rd. Niederhauser brought the paper in and laid it on the desk and I told him that that didn't interest me in the least. * * * Niederhauser may have told me that there wasn't any other market for milk in Marshalltown. I presume he did now that I am reminded of it. In our conversation on February 1st, 3rd and on Thursday of the week of February 3rd, and on February 11th, there wasn't anything said about

the milk being dirty because after I had shown Niederhauser the dirt I got out of the milk he got to straining it in the regular manner and I didn't go back to the matter of clean milk. That complaint had been taken care of in the fall.'' There is no claim that defendant did anything in the way of rescinding the contract. Defendant simply undertook to terminate it from February 10, 1930. The city ordinance requires that all milk sold shall be produced from cows which have been placed and maintained under State or Federal supervision for the eradication of tuberculosis, and which shall be tested for tuberculosis at least once a year. The regulations of the State Department of Agriculture provide that the intradermic tuberculin test will be accepted providing it has been applied by a regularly employed state or federal veterinarian, an accredited veterinarian, or by an approved veterinarian when endorsed by the authorities of the state of origin, providing the observations be made at the 72nd hour; that certificate shall be good for one year unless sooner revoked. Defendant did not know until February first that more than a year had elapsed since plaintiff's herd had been tested.

The requirement of the contract that the cows be ''tubercular tested'' is an important one for two reasons, first the assurance it gives to the purchaser that the milk he is purchasing is free from tubercular infection, and second the assurance that the purchaser may thereby give to its customers. Non-performance or breach of this clause of the agreement may or may not be important. In the case before us the plaintiff's herd had been tested. He had tried to have the test renewed. The defendant had taken the milk and got precisely the same article as if the test-had been renewed within the year. He did not refuse to take the milk after February 10th because the milk then tendered was not in compliance with the contract. The breach of which defendant complained was, at the time that it undertook to terminate the contract, purely academic unless defendant was, as it suggests, liable to prosecution for violation of the ordinance. Defendant did not know that it was selling milk from cows that had not been tested within the year. (If it did know it waived the breach.) The sales made by defendant were of milk purchased under contract bona fide requiring that the milk be from tuberculin tested cows. Defendant did not intend

to sell milk in violation of the ordinance. The plaintiff had attempted to obtain a. test. As soon as objection was made plaintiff did secure a test, though the veterinarian who made the test was not "accredited." Defendant did not refuse to take the milk because it did not comply with the contract but because he had previously terminated it. Within a few days later plaintiff applied for a Department test and within a few weeks obtained it. So far as appears the delay was not for plaintiff's fault other than delay in asking for it. The breach of the contract was not willful and on the undisputed evidence was unimportant. Plaintiff never renounced the contract or his duty under it or refused to observe it. Defendant did not refuse to take the milk because of any intended or expected future delinquency on the part of the plaintiff, but merely for a past breach from which defendant had sustained no injury and from which it shows no reasonable ground for apprehending injury. The contract is not an installment contract, or otherwise severable because plaintiff actually delivered to defendant his list of customers and relinquished to defendant his good will—a consideration that underlaid the contract for the entire three years' term. Defendant agreed not alone to pay the plaintiff the market price of the milk or a stated price based upon its actual or estimated market value but agreed to take the milk for three years and to pay 50c per 100 pounds in excess of the price paid to the patrons for milk of the same butter fat test. The plaintiff was given the option to discontinue delivery. Defendant retained no such option. The underlying consideration of the entire contract was the transfer of the milk business—the complete list of customers, the recommendation to customers, the good will. Defendant assumed to terminate the contract at the end of one and one-fourth years and to keep the business, the customers and the good will for a past breach without recognizing plaintiff's right to have the defendant continue to take the milk for three years and pay during the entire three years the extra price. Defendant assumed to do this not because it had been damaged or because the plaintiff refused to perform the contract or had renounced it or prevented defendant from performing. If the contract were merely an installment contract on which the deliveries made on one side had been paid for by the other or otherwise severable we would have before us the question of defendant's right to assert discharge as

to future installments by breach, but defendant has received in full that portion of the consideration which is entire as to the three years' contract and the 50¢ per 100 extra. Defendant has made no attempt at restoration or rescission.

" 'It is not a mere refusal or omission of one of the contracting parties to do something which he ought to do, that will justify the other in repudiating the contract; but there must be an absolute refusal to perform his part of the contract. * * * As, upon the facts, there appears to have been not only no absolute refusal to perform the contract by the plaintiffs, and, what is important, no evidence of inability on their part to perform it, I think the defendant had no right to treat the contract as rescinded, and to refuse to deliver the remainder of the iron.' * * * 'Merely because a given act or course of conduct of one party to a contract is inconsistent with the contract is not sufficient; it must be inconsistent with the intention to be longer bound by it.' " Mintle v. Sylvester, 202 Iowa 1128, 1135.

See, also, White v. Massee, 202 Iowa 1304; Quarton v. Law Book Co., 143 Iowa 517; 13 C. J. 613, 658; Shupe v. Thede, 205 Iowa 1019; 3 Elliott on Contracts, Section 2025; 5 Page on Contracts (2nd Ed.), Section 2880, 2926.

The general rule is that the party who has received and retained the benefits of a substantial part performance by the other cannot rescind. 13 C. J. 615. It is the importance of the breach, not of the covenant—it is a breach so substantial and fundamental as to go to the substance of the contract and defeat the object of the parties in making the agreement, that permits of a rescission. 6 R. C. L. 1014; 13 C. J. 613; Pickens County v. National Surety Co., 13 Fed. (2nd) 758, 762; Beattie v. Friddle (Ky.), 17 S. W. (2nd) 246; Speed v. Bailey (Md.), 139 Atl. 534; 3 Williston on Contracts, Section 1290. Defendant received a substantial consideration for its agreement to take the milk three years and to pay the extra 50c per 100 pounds. Defendant does not claim to have rescinded the contract. Such claim, if made could not be sustained because there was no return or offer to return the status quo, even though there could have been such a return. Butler Mfg. Co. v. Elliott, 211 Iowa 1068; Stauffer v. Mathison Motor Co., 207 Iowa 1038; Shupe v. Thede, 205 Iowa 1019. A contract cannot be rescinded because of failure of one

of the parties to perform where the parties cannot be restored to the status quo. 13 C. J. 620; Beattie v. Friddle (Ky.), 17 S. W. (2nd) 246; De Montague v. Bacharach, 63 N. E. 435, 181 Mass. 256.

Plaintiff's breach went only to part of the consideration. It could be fully compensated for in damages. Plaintiff, therefore, may recover in spite of breach. Boone v. Eyre, 2 W. Bl. *1312; 2 Williston on Contracts, Section 818, 841.

Defendant suggests that on rescission plaintiff would have to refund the premium in restoring the status quo. Both parties would be required to do what is equitable. Creveling v. Banta, 138 Iowa 47; Fagan v. Hook, 134 Iowa 381; 13 C. J. 621.

Defendant made no attempt to rescind or claim for restoration of the status quo. A consideration of the hypothetical rights of the parties, if the defendant had attempted rescission, is not involved.

It follows, therefore, that the contract was not rescinded, was not discharged by plaintiff's breach and is still in full force.

Defendant has broken the contract. This raises the question whether the contract was terminated by defendant's breach.

On February 3, 1930, defendant notified plaintiff that it would not take the milk any longer, except for a few days to give plaintiff a chance to turn it. On February 10th defendant refused to take the milk thereafter. Plaintiff did not accept the refusal or acquiesce in it or elect to terminate the contract, but told defendant "I was going to keep right on bringing my milk that I figured that I hadn't done anything wrong. * * * That afternoon told Jackson my intentions were to bring milk down in the morning but that I thought that I would come and see first if he would accept it so I wouldn't have to make a trip with the milk for nothing." Defendant refused to take the milk. Plaintiff thereafter disposed of the milk as best he could and now sues for damages. Plaintiff might undoubtedly have accepted defendant's renunciation of the contract as a discharge and might have maintained an action immediately for breach. Sprague, Warner & Co. v. Mercantile Co., 186 Iowa 488; McCormick v. Basal, 46 Iowa, 235; Crabtree v. Messersmith, 19 Iowa 179.

It was plaintiff's right to disregard the repudiation, to keep the contract alive, to perform or hold himself in readiness to

perform and to recover the contract price. McAllister v. Safley, 65 Iowa 719; Pate v. Ralston, 158 Iowa 411; Quarton v. American Law Book Co., 143 Iowa 517; Port Huron Machinery Co. v. Hurto, 154 Iowa 435; Mooney v. Newbern (N. J.), 137 Atl. 567; Lewis v. Scoville (Conn.), 108 Atl. 501; 5 Page on Contracts (2nd Ed.), Sections 2907, 2908, 2910.

He might also adopt the middle course of keeping the contract alive for the purpose of adjusting the rights of the parties arising from the breach. Dibble v. David Hodds Co. (Ore.), 286 Pac. 554, 557; 13 C. J. 701, 655; 3 Williston on Contracts, Section 1297, et seq. Though he would be required to take reasonable means not to enhance the damages. 3 Williston on Contracts, Section 1299, et seq. Under the uniform sales act the buyer is liable for no greater damages than the seller would have suffered if he did nothing toward carrying out the contract after receiving notice of the buyer's repudiation. Code, 1927, Section 9993. The contract was an installment contract by which settlements were to be made the 5th and 20th of each month, on refusal to make which an action would lie for the damages from that refusal. 3 Williston on Contracts, Section 1292. Whether or not plaintiff is required to include in his suit his claim for future as well as past damages is not before us. See 3 Williston on Contracts, Section 1292. Plaintiff having elected, as he had the right to do, to keep the contract in force defendant's breach did not discharge him from liability upon it for plaintiff's damages. The measure of damage is not a question before us.

One of the assignments of error is:

"That the undisputed evidence showed that appellee did not have his herd tested for tuberculosis from August 14, 1928, to February 6, 1930, and that the test of February 6, 1930, was not such a test as was required by the laws of the state of Iowa, the city ordinance of the city of Marshalltown, Iowa, or the rules and regulations of the state department of agriculture and did not comply with the terms of the contract; that appellant was justified in refusing to take the milk and in so notifying appellee on February 3, 1930, because the latter was then in default on a material condition of the contract and had been in default since August 14, 1929, and that appellant's final refusal to take milk on February 11, 1930, related back to the refusal of February

3, 1930, and there was no waiver by appellant on the condition of the contract requiring the tuberculin test.''

The suggestion that the test of February 6, 1930, did not comply with the contract and the law is an afterthought. Defendant did take the milk for a number of days but on the claim that the contract was at an end and defendant was taking the milk as matter of grace. Defendant's refusal on February 11th to take the milk was not on the ground that the milk then tendered did not comply with the contract. Defendant impliedly conceded that it did, that the cows had been tested but the contract had been previously terminated on account of the past breach. Plaintiff pleads estoppel. Defendant could not thus mend its hold. Farmers' Milling Co. v. Mill Owners Mutual Fire Ins. Co., 127 Iowa 314.

The issues were not framed nor was the case tried on the theory that defendant was not after February 10th required to take the milk because it did not then comply with the contract. Defendant accordingly argues:

''Did the failure of appellee to have his cows tuberculin tested constitute such a breach of the contract as to justify appellant in refusing to accept any more of the milk and thus terminate the contract? 2nd. Did appellant waive his breach by taking the milk for 8 more days and pasteurizing all of it for the express purpose of giving appellee a chance to get another outlet for his milk? * * * Appellee's cows were tested about August 14, 1928, three months before the contract went into effect. They were never tested again until after appellant terminated the contract on February 3, 1930. They should have been tested again by August 14, 1929, to meet the contract requirements. They were not so tested and appellee breached the contract in this particular from August 14, 1929, to February 3, 1930, the date of termination.''

Later defendant suggests in argument:

''The plain import of that ordinance is to require tests of cows or herds at least once a year by an 'accredited veterinarian.' So that the purported test of appellee's herd by Dr. Mahlon Russell on February 3rd to February 6, 1930, was not such a test as the contract called for and did not place appellee

in the position of having fulfilled the contract terms in that respect, even though it were contended that appellant waived the breach by taking the milk after February 3, 1930. This would leave appellee in default on the contract, even on February 11, 1930, when his milk was finally refused by appellant.''

This latter suggestion if it had been made an issue and tried would have raised a number of important questions not now necessary to be considered such as the interpretation of the contract and ordinance, the matter of substantial compliance and waiver and estoppel.

I think the judgment should be affirmed.

Evans, J., concurs in this dissent.