**David SERGEANT, as Trustee for the Estate of Merlyn J. Pollock, d/b/a Polite Real Estate, Bankrupt, Appellee,**

v.

**Eugene LEONARD and Irene M. Leonard, Appellants.**

**No. 65500.**

Supreme Court of Iowa.

Nov. 25, 1981.

H. A. Stoebe, Humboldt, for appellants.

James L. Kramer of Johnson, Erb, Latham & Gibb, P. C., Fort Dodge, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and SCHULTZ, JJ.

UHLENHOPP, Justice.

The principal problem in this appeal is whether an oral agreement, following a written listing of property with a broker, constituted an accord or a substituted con-

tract. The action was tried by ordinary proceedings and the trial court's findings therefore have the effect of a special verdict; they are binding on us if supported by substantial evidence. Iowa R.App.P. 14(*f*)(1). We view the evidence in the light most favorable to the judgment, which was for the broker. *Nora Springs Co-op Co. v. Brandau*, 247 N.W.2d 744, 747 (Iowa 1976). Although the action is by the broker's bankruptcy trustee, we will speak of the broker as the plaintiff.

Eugene and Irene M. Leonard owned a substantial hardware business, including the building and land, in Humboldt, Iowa. The business was in corporate form, but the Leonards owned all the corporate stock and were the corporate officers and directors.

The Leonards desired to sell the business, and listed it for sale with a broker—Merlyn J. Pollock operating as Polite Real Estate—for $650,000. The business had various debts which the Leonards would have to pay out of the proceeds; their net would thus be considerably less than $650,000. Moreover, they had personally guaranteed at least some of those debts. The written listing was by the Leonards themselves, was for 180 days, was exclusive, and was of the property itself, not of the corporate stock. Presumably if the Leonards made a sale, the bill of sale and deed would actually be by their corporation which was the titleholder. The commission was a flat $50,000, and was payable, under clause (a), "If said Broker finds a buyer who shall be ready, willing and able to purchase during said period upon the price and terms above stated *or at any other price and terms that may be agreed upon....*" (Emphasis added.)

The broker incurred expense in finding prospects. He was aware of about eight individuals who might be interested and narrowed the field to two couples. The first couple was K. E. and Joan E. Kollmorgen; they made a written offer of $650,000 accompanied by their check for $50,000 as a down payment. The offer varied in some respects from the listing. It was signed by Mrs. Kollmorgen, as Mr. Kollmorgen was in school at the time, but no question appears to exist that the offer was by both of them; Mr. Kollmorgen signed the check. The offer was for the property, not for the corporate stock, and ran to the Leonards individually. The Leonards had tax counsel at the time, and after consultation they rejected the offer for tax reasons. They do not appear to have incurred liability for the broker's commission by virtue of this offer, since it did not fully comply with the terms of the listing and they did not accept it.

Shortly thereafter the broker obtained and submitted another written offer for $650,000, this one by Gary and Linda Currie. This too varied in some respects from the listing, and the Leonards also rejected this offer for tax reasons. Again the offer was for the property, not the corporate stock, and ran to the Leonards themselves.

Soon afterward a salesman for the broker found a third prospect, Vincent H. Kopacek. After the salesman and the broker brought the Leonards and Kopacek together, the latter parties appear to have done most of their own negotiating of terms. Toward the end of negotiations Kopacek did not want the broker or his salesman to participate further and, at Eugene Leonard's oral request, the broker and salesman did not do so. We will subsequently return to that oral request.

The Leonards and Kopacek arrived at a contract; in the formation of the contract itself Kopacek had an attorney but the Leonards did not. The contract took care of Kopacek's interests very adequately; it protected the Leonards' interests less well. The sale of the business was not for $650,000 as in the previous offers. Moreover, it was to be accomplished by the Leonards' transferring their corporate stock to Kopacek, rather than by a transfer of the property. The value of the stock was to be ascertained by finding the "audited book value" and by subtracting the liabilities of the business. The inventory was to be valued at the lower of (a) 68% or retail value or (b) market value, but the contract also contained this clause:

In no event shall the inventory exceed $350,000. If said inventory does exceed

$350,000 Seller shall give to Buyer without charge all said inventory above $350,-000. If said inventory is below $350,000, then purchase price shall be reduced dollar for dollar respectively.

Two of the more significant factors in the transaction related to an additional corporate income tax liability and to the clause we have just quoted. Through the years the Leonards had not kept the inventory valued realistically. As a result, the actual value of the inventory, ascertained by audit under the contract, turned out to be $610,-000. The effect of this valuation, of course, was to increase the income tax liability of the corporation, and, under the contract, this tax reduced the sum going to the Leonards for their stock. This cost them $99,-297. (The question of the Leonards' personal income tax liability, if any, arising out of the transfer of their stock is not involved here.)

The second factor was even more damaging to the Leonards. Although the inventory was ascertained to be worth $610,000, Kopacek was entitled to it for $350,000 in valuing the corporate stock under the contract clause. This cost the Leonards an additional $260,000. The combined result of the deduction of the corporation's liabilities and of the inventory audit was that the Leonards became entitled to a net of $189,-604 for their corporate stock.

Reverting to Eugene Leonard's oral request for the broker and his salesman to lay back, the Leonards and Kopacek had apparently arrived at a final draft, or a near final draft, of their contract. Eugene Leonard came to the office of Merlyn J. Pollock, the broker, and gave him the understanding that Kopacek did not desire his further presence. Pollock acknowledged that times might arise for brokers to step aside during negotiations by principals. From that point in the Leonard-Pollock conversation, however, those two individuals were diametrically opposed in their testimony. Since the trial court adopted Pollock's version we will give only Leonard's conclusion, as to his version. He testified the conversation was in substance that if the Leonards signed the Kopacek contract Pollock's commission was to be $10,000. Leonard presently acknowledges that he owes that amount, and the Leonards offered to confess judgment for it.

Pollock's version is quite different. He testified in substance that he still had two willing and able buyers for hardware businesses, that Leonard was on the board of directors of a hardware association and said he had two hardware store owners "in his pocket" whom he could get to list their stores with Pollock at 10% commission, and that he, Pollock, said he would reduce his present commission to $15,000 if Leonard got the two listings for him. According to Pollock, Leonard then left Pollock's place of business, and Pollock subsequently learned that the Leonards had signed a contract with Kopacek.

Leonard never obtained two listings for Pollock and the Leonards never paid him $15,000. Instead, they refused to perform their contract with Kopacek. Kopacek sued them, obtained a decree of specific performance, and secured an affirmance by the Iowa Court of Appeals on appeal. *Kopacek v. Leonard*, 281 N.W.2d 37 (Iowa App.1979) (table). We denied further review.

Pollock later went bankrupt, and still later his trustee commenced the present action against the Leonards to recover the commission of $50,000 under the listing. The trial court found for the trustee in that amount, and the Leonards appealed.

The Leonards contend on appeal that (1) the trial court abused its discretion in permitting the trustee to amend his petition at trial, (2) the original listing was "merged" into the subsequent oral contract and cannot be enforced, and (3) Pollock was not a registered securities broker and cannot recover a commission for the sale of the corporate stock.

■ I. *Amendment of petition.* At the commencement of trial the broker amended his petition over the Leonards' objection, to rely on the first two offers which the broker obtained as entitling the broker to a commission. On allowance of amendments

to pleadings, *see Ackerman v. Lauver*, 242 N.W.2d 342 (Iowa 1976).

This amendment in no way harmed the Leonards. Neither the trial court nor we allow recovery in this action based on the two prior offers, but rather on the basis of the sale to Kopacek. The two sets of prior prospective buyers and their offers could be shown in any event as tending to corroborate Pollock's version of the Leonard-Pollock conversation that Leonard was to get two more listings for Pollock. We find no reversible error here.

II. *"Merger."* The Leonards' second contention involves the familiar problem in which a creditor and debtor subsequently agree upon a different performance by the debtor, the debtor defaults on the new agreement, and the creditor seeks to recover on the original obligation. *See generally* Graven, *The Out-Moded Terminology of Accord and Satisfaction*, 24 Iowa L.Rev. 697 (1939).

We stated in *Gatton v. Stephen*, 239 N.W.2d 159, 161 (Iowa 1976):

> A realtor's commission may be earned in any of the three ways stated in *Ducommun v. Johnson*, 252 Iowa 1192, 1196, 110 N.W.2d 271, 273: "First, by effecting a binding contract of sale under authority given to the agent to make such a contract for the principal; second, by producing a purchaser to whom a sale is in fact made; third, by producing a purchaser ready, willing and able to buy on terms specified in the agency agreement." In the third situation, if the realtor "finds a customer who is able and willing to take the property at [the stated] price, and upon the stated terms, he is entitled to compensation whether a sale is effected or not." *Murphy v. Brown*, 252 Iowa 764, 767, 108 N.W.2d 353, 355.

In this case the broker through his salesman produced Kopacek, the purchaser, and when the Leonards sold to Kopacek the broker became entitled to his commission of $50,-000. Indeed, paragraph (a) of the written listing contract expressly covered that situation.

With this liability hanging over the Leonards, Eugene Leonard approached the broker about modifying the liability for the commission. We take it that Leonard was speaking for himself and his wife in this conversation. The first step in the problem is to ascertain as a fact the terms of the modification agreement. We need not linger over that step, however, because the trial court, on substantial evidence, found as a fact that the broker agreed to reduce his commission to $15,000 if Leonard obtained two additional hardware store listings. These were to be at 10% commission. We understand that the modification was the obligation of both of the Leonards and that the broker did not release either of them from the listing contract.

The Leonards signed the Kopacek contract, but Leonard did not produce two listings and the Leonards did not pay $15,-000. The oral agreement between the Leonards and Pollock was breached by the Leonards. Instead, the Leonards tried, unsuccessfully, to get out of the Kopacek contract.

The second step in the problem is a legal issue for us to decide: the effect of the modification, as proven, upon the Leonards' obligation for a commission of $50,000 under the original listing. The modification undoubtedly was supported by consideration, and we therefore do not have a question of that kind. *Cf. Recker v. Gustafson*, 279 N.W.2d 744, 759 (Iowa 1979) ("new consideration is necessary to support a contract modification").

Two principal legal situations may arise when a contract obligation is modified, an accord or a substituted contract. With an accord the parties intend that the original contract obligation remains viable but that it is suspended pending performance by the debtor of the modification. If the debtor breaches the modification, the creditor may sue on the original contract or on the modification. The American Law Institute states in *Restatement (Second) of Contracts* § 281 (1981):

> (1) An accord is a contract under which an obligee promises to accept a stated

performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty.

(2) Until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction. If there is such a breach, the obligee may enforce either the original duty or any duty under the accord.

(3) Breach of the accord by the obligee does not discharge the original duty, but the obligor may maintain a suit for specific performance of the accord, in addition to any claim for damages for partial breach.

Illustrations of an accord are *Graham v. Crisman*, 169 Iowa 91, 146 N.W. 756 (1914); *Brent v. Head, Westervelt & Co.*, 138 Iowa 146, 115 N.W. 1106 (1908); *Hart v. National Masonic Accident Ass'n*, 105 Iowa 717, 75 N.W. 508 (1898); *Bradley v. Palen*, 78 Iowa 126, 42 N.W. 623 (1889).

With a substituted contract the parties intend to terminate the original contract obligation and to substitute the modification. If the debtor breaches the modification, the creditor may sue only on that agreement. The same *Restatement* states in section 279:

(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.

(2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

Illustrations of this principle are *Williams v. Farmers' Mutual Hail Insurance Ass'n*, 204 Iowa 991, 216 N.W. 269 (1927); *Williams Shoe Co. v. Gotzian*, 130 Iowa 710, 107 N.W. 807 (1906); *Lindt v. Schlitz Brewing Co.*, 113 Iowa 200, 84 N.W. 1059 (1901); *Sioux City Stock-Yards Co. v. Sioux City Packing Co.*, 110 Iowa 396, 81 N.W. 712 (1900).

■ The inquiry, then, is whether the broker and the Leonards intended *to suspend* the listing contract pending performance of the modification by the Leonards, or *to nullify* it and substitute the modifying agreement. The *Restatement* gives the following guidance for such an inquiry in Comment *e* to section 281:

Whether a contract is an accord or a substitute contract is a question of interpretation, subject to the general rules stated in Chapter 9. In resolving doubts in this regard, a court is less likely to conclude that an obligee was willing to accept a mere promise in satisfaction of an original duty that was clear than in satisfaction of one that was doubtful. It is therefore less likely to find a substituted contract and more likely to find an accord if the original duty was one to pay money, if it was undisputed, if it was liquidated and if it was matured.

*See also Restatement (Second) of Contracts* § 279, Comment *c* (1981); 6 *Corbin on Contracts* § 1268, at 72–74, and § 1293, at 190–91 (1962); 15 *Williston on Contracts* §§ 1846, 1847 (Jaeger 3rd ed. 1972).

The trial court held that the broker could enforce the original listing on the Leonards' breach of the modification. We agree. In construing the modification, we note that it was not in terms of accepting the different performance in lieu of the original obligation. Instead, the language was conditional in nature: the broker would reduce the commission to $15,000 *if* Leonard produced two listings at 10% commission.

The case is quite like *Ogilvie v. Hallam*, 58 Iowa 714, 12 N.W. 730 (1882). In that case the written modification stated:

"I, T. J. Hallam, and C. B. Ogilvie, of the county of Muscatine, and state of Iowa, do hereby agree to settle all matters between us as follows, to-wit: that I, T. J. Hallam, do hereby agree to deliver to C. B. Ogilvie his sorrel mare, three years old, white in the face, to be delivered within one week from this date; and I, C. B. Ogilvie, do hereby agree to dismiss all suits against the said Hallam that is now pending against said Hallam, on delivery of the said mare. I, T. J. Hallam, agree to pay all the witness fees that I had subpoenaed in justice's court,

and Ogilvie agrees to pay balance of costs. August 23, 1880."

*Id.* at 715, 12 N.W. at 731. This court held:

Counsel for the appellant insist, as we understand, that upon the execution of the agreement both the accord and the satisfaction became an accomplished fact without the delivery of the mare. The agreement took the place of the old debt or right, and the pending action must be dismissed and an action brought on the agreement to enforce it, if it was not performed on the defendant's part. In support of this position *Hull [Hall] v. Smith*, 15 Iowa 584, and *Merry v. Allen*, 39 Iowa 235, are cited. If the premises are correct it is possible that the conclusion is. But the circuit court held the agreement was conditional, and that the plaintiff did not absolutely agree to dismiss this action; but that he agreed to do so only upon the defendant's performance of the agreement on his part; that is to say, the delivery of the mare was a condition precedent to the dismissal of the action. The delivery being the satisfaction agreed upon, we think the ruling of the circuit court is, undoubtedly, correct.

*Id.* at 715–16, 12 N.W. at 731.

We hold that the modification in the Pollock-Leonard conversation was an accord and that, upon breach of it by the Leonards, the broker could recover on the original listing.

III. *Estoppel.* The Leonards contend that the broker agreed to reduce his commission if the Leonards entered into the Kopacek contract, which they did, and that the broker is therefore estopped to change his position. *See Merrifield v. Troutner,* 269 N.W.2d 136 (Iowa 1978).

■ That basis of recovery, however, is completely undercut by the trial court's fact findings on substantial evidence. The court found in accordance with the broker's version, that Leonard was to produce two additional listings and the Leonards were to pay $15,000, none of which was done. Assuming that this case is otherwise appropriate for application of estoppel, the Leonards could not estop the broker by their acting in reliance unless they acted in reliance on the agreement which the trial court found was actually made. The Leonards, however, do not claim they acted in reliance on that agreement; they deny that agreement. Moreover, the Leonards could not estop the broker unless they performed their side of the modification agreement, which they did not do. They are in the position of a party in default. *Neiderhauser v. Jackson Dairy Co.,* 213 Iowa 285, 290, 237 N.W. 222, 224 (1931); 11 Am.Jur.2d *Contracts* § 446 (1964); 17A C.J.S. *Contracts* § 473 (1963).

■ The Leonards point out that the broker called Eugene Leonard as a witness and they apparently contend that the broker is bound by his testimony. But the broker can rely on the most favorable evidence in the record, which is of a substantial nature, and is not bound by Leonard's testimony. *Schmidt v. Jenkins Truck Line, Inc.,* 170 N.W.2d 632, 644–46 (Iowa 1969).

We do not find merit in the Leonards' contention of estoppel.

IV. *Lack of registration.* Pollock held a real estate broker's license but was not registered as a securities broker-dealer. Kopacek actually purchased corporate stock from the Leonards. Our blue sky law provides in section 502.102(4), The Code 1981:

"*Broker-dealer*" means any person engaged in the business of effecting transactions in securities for the account of others or for such person's own account.

The section then enumerates exceptions.

Part III of the same chapter of the Code authorizes registration of broker-dealers, and section 502.301(1) provides:

It is unlawful for any person to transact business in this state as a broker-dealer or agent unless registered under this chapter.

■ We apply the blue sky requirements to all securities transactions and individuals fairly within their terms but conversely, we do not apply them to transactions and individuals not within their terms. *Midwest Management Corp. v. Stephens,* 291 N.W.2d 896, 901–02 (Iowa 1980).

Although the Leonards cite section 502.-102(12) of the Code ("'Security' means any ... stock [or] transferable share...."), their reliance is not actually on the non-registration of the stock. Rather, they rely on Pollock's non-registration as a broker-dealer. The answer to whether this disentitles him to the commission he would otherwise be entitled to turns on the facts. We pass the question of whether Pollock had to be registered to sell corporate stock if the stock was itself exempt from registration. 69 Am.Jur.2d *Securities Regulation-State* § 16, at 1077 (1973); 79 C.J.S.Supp. *Securities Regulation* § 217, at p. 510 (1974).

Turning to the facts, this is not a case in which stockholders, intending to sell stock, and an agent, intending to sell it for them, evade the securities broker-dealer registration requirement by couching the listing contract in terms of the property but ultimately sell the stock. Under this record the good faith of the Leonards in listing the property itself, and of the broker in taking the listing, cannot be questioned. Technically, perhaps, the listing of the property should have been by the corporation itself, which held title to the property. But the Leonards controlled the corporation. They were the sole stockholders, directors, and officers, and if they accepted an offer to purchase the property they could cause a proper conveyance of it by the corporation.

Subsequent events bear out the good faith of the Leonards and the broker. The first offer, by the Kollmorgens, was to buy the property, not the stock, and it ran to the Leonards individually. The same is true of the second offer. That these were genuine offers, not mere window dressing, likewise cannot be questioned under the record.

Nothing in the record indicates that the broker's salesman acted in any different way. He too brought a prospective purchaser of the hardware business, Kopacek. At this point, however, apparently for the Leonards' tax purposes, the contract turned into the sale and purchase of the corporate stock.

The issue, therefore, is whether a real estate broker who in good faith has property listed with him for sale and who produces a purchaser, is deprived of the commission he would otherwise receive because the sellers decide, for reasons of their own, to effect the sale by means of the transfer of their corporate stock rather than by corporate transfer of the property.

Merely stating this issue, we think, answers it. Any vendor who happened to have his business in corporate form could take advantage of a real estate broker's efforts, expense, and production of a buyer, transfer his stock instead of the property, and then bid the broker farewell. The decisions do not support such an unjust result; they allow the broker his commission. *Maganas v. Northrup*, 112 Ariz. 46, 537 P.2d 595 (1975); *Lyons v. Stevenson*, 65 Cal. App.3d 595, 135 Cal.Rptr. 457 (1977); *Weber v. Jorgensen*, 16 Cal.App.3d 74, 93 Cal. Rptr. 668 (1971); *Stoll v. Mallory*, 173 Cal. App.2d 694, 343 P.2d 970 (1959).

Thus assuming without deciding that this corporate stock had to be registered and that this broker likewise would have had to be registered if he had sold the stock, we hold on the present facts that the broker is nonetheless entitled to his commission. He in fact sold the property for the sellers, but the sellers, for their own reasons, elected to effect the conveyance by a transfer of their stock.

We uphold the judgment.

AFFIRMED.