In re Myron Jay ANDERSON dba
Country Wide Tire, Debtor.

ALDEN STATE BANK, Plaintiff,

v.

Myron Jay ANDERSON, Defendant.

Bankruptcy No. 80–03244.
Adv. No. 80–0360.

United States Bankruptcy Court,
N.D. Iowa.

April 11, 1983.

James P. Walters, Iowa Falls, Iowa, for plaintiff.

Kieth Van Doren, Webster City, Iowa, for defendant.

Findings of Fact, Conclusions of Law, and ORDER Denying Plaintiff's § 523(a)(2) Dischargeability Complaint

WILLIAM W. THINNES, Bankruptcy Judge.

This matter is before the Court on Plaintiff Alden State Bank's Complaint to deter-mine dischargeability of its debt pursuant to 11 U.S.C. § 523(a)(2). The matter came on for trial at which James P. Walters represented the Plaintiff and Kieth Van Doren represented the Defendant. At the close of the Plaintiff's case, the Defendant moved for a directed verdict. Argument was heard and the Court took the Motion for Directed Verdict under advisement. The Defendant then presented his case. The parties were given thirty days from the date of trial to submit briefs and argu-ments, after which time the matter was fully submitted. The Court, having been fully advised and having reviewed the evi-dence and applicable law, now makes the following Findings of Fact, Conclusions of Law, and Orders.

## FINDINGS OF FACT

1. In March of 1978, Myron Anderson, the Debtor herein, and Gary Christeson be-gan operating a retail tire store known as Country Wide Tire.

2. Anderson and Christeson first visited the Plaintiff, Alden State Bank, in May of 1978, to obtain financing for the business. They met and discussed their situation with Carl Dencklau, Executive Vice President and major loan officer of the Bank. Denck-lau requested that the two formalize their business relationship by signing a binding partnership agreement. The two partners entered into a partnership agreement (Plaintiff's Exhibit 1), which indicates that it was entered into on March 18, 1978. The acknowledgements, however, indicate that Christeson and Anderson did not sign the agreement until May 17 and 18, 1978, re-spectively.

3. The original installment loan, evi-denced by Note No. 866, (Plaintiff's Exhibit No. 2), in the amount of $18,316.80, was entered into on May 19, 1978 and was signed by both partners. The Bank took a nonpurchase-money security interest in the equipment and inventory then owned or thereafter acquired by the business, and perfected its security interest.

4. Between May, 1978, and December, 1978, the Bank continued to loan the partnership money for inventory and operating expenses.

5. In December of 1978, at a time when Country Wide Tire owed the Bank nearly $50,000.00, the partners met with Dencklau at their place of business. The purpose of this meeting was for Dencklau to examine the building and the business inventory and to discuss the health of the business. The partners informed Dencklau that they had on hand $80,000—$100,000 of inventory at that time. Dencklau first requested at this meeting that the partners supply the Bank with certain written financial information regarding the business.

6. On December 27, 1978, the Bank advanced $10,000.00 of new money for business inventory, and the partners signed a promissory note evidencing the indebtedness.

7. At some point after the December meeting, Christeson prepared an inventory list and submitted it to the Bank. The testimony of Carl Dencklau at trial indicates that this list was not inaccurate and that the Bank is not questioning it.

8. In January, before receiving any financial statements from the partnership, the Bank again advanced new money to Country Wide Tire. On January 11, 1979, the Bank renewed a previous installment note and advanced new money to the partnership, taking a new 36-month installment note in the amount of $33,906.24. (Note No. 989, Plaintiff's Exhibit No. 4). On January 26, 1979, the Bank gave the partnership $15,000.00 of new money and the partners signed a new 60-day note, (Note No. 1876, Plaintiff's Exhibit No. 5).

9. On February 5, 1979, Myron Anderson signed a Profit and Loss Statement prepared by I.W. Milliken Company for Country Wide Tire, and subsequently delivered it to the Bank. By the time it was delivered, however, the Bank had already loaned over $77,000 to the partnership based only upon the partners' oral assertions of what the business was worth and upon Dencklau's visual examination of the inventory and other property.

10. After receiving the Profit and Loss Statement, the Bank advanced additional new money to the partnership. On February 14, 1979, $20,000 was advanced for inventory on the basis of a 90-day promissory note, (Note No. 1928, Plaintiff's Exhibit No. 6), and security agreement given by the partners. On February 27, 1979, $2,780.00 of new money was issued for inventory on the basis of a 60-day note (Note No. 1977, Plaintiff's Exhibit No. 7).

11. During the latter part of March, 1979, the partners accumulated and submitted to the Bank the information necessary to complete a financial statement. The financial statement form itself was filled out by an employee of the Bank on March 27, 1979, and signed by both partners on March 29, 1979. Both partners supplied information for the financial statement, but Christeson supplied the bulk of the information. At the time he signed the statement, Anderson had no reason to believe that anything on it was false or improper.

12. On the financial statement form itself was printed the following: "For the purpose of obtaining credit, I hereby tender the following statement as of [March 27, 1979 (typed in)] and agree to notify you promptly of any change affecting ability to pay."

13. The following information is listed on the financial statement as assets of the partnership:

| | |
|---|---:|
| Cash on hand and on deposit | $ 2,440.00 |
| Notes receivable, not due, but maturing within six months | 39,938.00 |
| Merchandise at cost | 95,217.00 |
| Total current assets | $ 137,595.00 |

Other assets include:

| | |
|---|---:|
| Machinery and tools less depreciation | $ 12,095.00 |
| One 1978 Ford ½-ton pickup | 7,000.00 |
| 1977 Chevrolet 4 × 4 | 6,000.00 |
| One 79 one-ton with compressor | 10,500.00 |
| One 1969 ¾-ton pickup | 750.00 |
| Machinery, equipment, trailer | 750.00 |
| Total assets | $ 174,690.00 |

The information on the financial statement indicates that the partnership's liabilities were as follows:

| | |
|---|---|
| Notes payable, due within one year to Alden State Bank | $ 100,000.00 |
| Accounts payable for merchandise not due | 12,050.00 |
| Total current liabilities | $ 112,050.00 |
| | |
| Net worth (total assets—total liabilities) | $ 62,640.00 |

14. The financial statement further indicates that total sales for the previous six-months of operation totaled $210,874.59; the cost of these sales was $147,786.27; the gross profit was $63,088.32 and the net profit for this period was $29,232.06, the same amount shown as net profit on the profit and loss statement of February 5, 1979.

15. At the time the financial statement was delivered to the Bank, Country Wide Tires actually owed three of its suppliers over $44,900 for accounts payable for inventory.

16. After the Bank received the financial statement, no new money was advanced to the business at any time. On May 8, 1979, however, the Bank did renew three past-due short-term notes into one note, Note No. 2246 (Plaintiff's Exhibit 8), for their face value, $27,780.00. Dencklau testified at trial that the Bank would not have renewed these loans if they had known that the amount owing to the suppliers at that time was approximately $45,000.00.

17. On June 6, 1979, I.W. Milliken Company prepared a financial report of the April and May income of Country Wide Tire. On June 7, 1979, I.W. Milliken prepared a financial report of the expenses incurred by the business during April and May of that year.

18. Some time during May or June of 1979, Gary Christeson had a mental breakdown and Anderson took over operation of the business. Anderson began to realize that there was a substantial amount of inventory on hand for which the suppliers had not been paid.

19. On July 3, 1979, a meeting was held between Carl Dencklau, Myron Anderson, and Myron Anderson's father, for the purpose of discussing the financial situation of the business. Upon the Bank's request for an influx of new credit, Anderson's father placed $10,000.00 into the general business funds.

20. Sometime in July 1979, after the meeting between Dencklau and the Andersons, Myron Anderson informed Dencklau of the true nature of Country Wide Tire's debt structure.

21. The Bank denied a loan to Anderson sometime during the summer of 1979. After July, 1979, Anderson continued to work with the Bank in an unsuccessful attempt to keep Country Wide Tire in business.

22. On September 14, 1979, the Bank renewed two previous notes and took a 12-month promissory note from Anderson. This note, No. 2676, (Plaintiff's Exhibit 9) was in the face amount of $39,695.83 and was labeled a "personal assumption" of Country Wide Tire notes. There is no record of any payments having been made on this note. On September 18, 1979, the Bank issued a 48-month promissory note as a renewal of two of the partnership's original loans. This note, No. 2694, (Plaintiff's Exhibit 10) was in the face amount of $41,-142.08. There is a record of some payments made through January 23, 1980, which left an unpaid balance of $39,782.15. On June 18, 1980, $14,500.00 was credited to the unpaid principal, leaving an unpaid balance as of that date of $25,282.15.

23. On June 9, 1980, Myron Anderson voluntarily surrendered to Alden State Bank its collateral, including all tires, tubes, wheels, equipment, accounts receivable, contracts, and contract rights, and motor vehicles.

24. On June 18, 1980, the business was finally sold to Dean Swanson for a total of $14,500.00 which sum was voluntarily given over to the Bank. At the time of the sale, business inventory was reduced and the business was suffering.

25. On June 18, 1980, Myron Anderson signed a deficiency balance agreement stating that he agreed to pay Alden State Bank $50,000.00 at nine per cent interest from that date to "settle [the] indebtedness left

after the sale of [the] collateral of [the] business." He also agreed that it would be necessary for him to file bankruptcy, and in that bankruptcy proceeding he would reaffirm and would not seek to discharge the $50,000.00 debt to Alden State Bank.

26. Also on June 18, 1980, Anderson signed an unnumbered promissory note for $50,000.00, due in twelve months, marked as "settlement on notes."

27. On August 14, 1980, Myron Anderson, doing business as Country Wide Tire, filed a voluntary Chapter 7 bankruptcy petition in this Court.

28. On October 1, 1980, Alden State Bank, filed this Adversary proceeding.

29. On November 6, 1980, the Debtor was discharged by Order of this Court, without having reaffirmed the debt owed to Alden State Bank.

30. The statements made by Anderson and Christeson regarding the value of the partnership's inventory, the condition of the business, and the debt structure of the business are statements respecting the financial condition of Country Wide Tire.

31. The Profit and Loss Statement of February 5, 1979, does not contain materially false representations.

32. The Financial Statement of Country Wide Tire, dated March 29, 1979, contained materially false statements.

33. Anderson did not intend to deceive the bank by submitting a materially false Financial Statement.

34. The bank did not reasonably rely upon the Profit and Loss Statement of February 5, 1979, in making or renewing any loans to the partnership, or to the Debtor.

35. The bank did rely upon the Financial Statement of March 29, 1979, in making renewal note No. 2246, but such reliance was unreasonable.

36. The bank did not reasonably rely on any financial statement in renewing any notes after the bank learned of the Financial Statement's falsity in July of 1979.

## CONCLUSIONS OF LAW

1. A Motion for directed verdict will be denied if, after viewing the evidence and any reasonable inferences in the light most favorable to the non-moving party, the Court finds reasonable minds might differ as to the conclusions to be drawn.

2. Statements as to the value of the inventory of Country Wide Tire relate to the financial condition of an insider, and must be in writing in order to be a basis for a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(B).

3. A creditor seeking a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(B) must prove each element of that objection by clear and convincing evidence.

4. The intent, if any, of the debtor's partner, Gary Christeson, to deceive Alden State Bank by delivering a materially false financial statement will not be imputed to Myron Anderson where Anderson was honest and forthright with the bank at all times and informed it of the business' true financial situation after he first learned of it, and where he was not actively engaged in the financial operations of the business at the time the statements were made, and had no reason to believe the information was false.

5. The Bank did not reasonably rely on any written statements of financial condition submitted to it by the Debtor or his partner in connection with the operation of Country Wide Tire.

## ORDERS

IT IS THEREFORE ORDERED that the Defendant's Motion for Directed Verdict is denied and dismissed.

IT IS FURTHER ORDERED that the Complaint filed by Alden State Bank to determine the dischargeability of a debt owed to it by Myron Anderson is hereby denied and dismissed.

IT IS FURTHER ORDERED that the Plaintiff's debt owed to Alden State Bank is included within the effect of his discharge.

## MEMORANDUM

This matter came on for trial before the Court on Alden State Bank's complaint to determine dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2). At the close of the Plaintiff's case, the Defendant moved for directed verdict, stating that the Plaintiff failed to establish a *prima facie* case for nondischargeability pursuant to § 523(a)(2), and the Court took the Motion under advisement.

■ A directed verdict is appropriate when, after viewing the evidence and any reasonable inferences therefrom in the light most favorable to the non-moving party, the Court finds that reasonable minds might differ as to the conclusions to be drawn from those facts and inferences. *Banks v. Koehring Co.,* 538 F.2d 176, 178 (8th Cir.1976), and *Kropp v. Ziebarth,* 601 F.2d 1348, 1352 (8th Cir.1979). A directed verdict will not be granted where the evidence reasonably supports more than one reasonable conclusion. *Kropp,* 601 F.2d at 1352. A directed verdict is not appropriate in this case and the Defendant's Motion is therefore denied and dismissed.

Alden State Bank contends that the debt owed to it by Myron Anderson should not be discharged because the debt was incurred by the use of false representations and a false financial statement. 11 U.S.C.

§ 523(a)(2).[1] Debts incurred in this manner are divided into two mutually exclusive categories under this subsection of the Bankruptcy Code. False statements concerning the debtor's or an insider's[2] financial condition will be analyzed under 11 U.S.C. § 523(a)(2)(B); representations which do not deal with the debtor's or an insider's financial condition will be analyzed under 11 U.S.C. § 523(a)(2)(A).

The oral representations of the partners regarding the value of the partnership's inventory clearly constitute statements respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2). Such oral statements regarding the partnership's financial condition will not serve as the basis for the Bank's exception to discharge under 11 U.S.C. § 523(a)(2)(B).

The statements which are of concern in this matter are the profit and loss statement (Plaintiff's Exhibit 17) signed by the Debtor on February 5, 1979, and submitted to the Bank sometime thereafter, and the financial statement (Plaintiff's Exhibit 16) signed by the Debtor and his partner on March 29, 1979. Both of these statements concern the financial condition of Country Wide Tire, an insider, and therefore the applicable analysis is under subparagraph (B).[3]

1. 11 U.S.C. § 523(a)(2) provides that a debtor will not be discharged from a debt "for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—(A) false pretenses, a false representation, or actual fraud other than a statement respecting the debtor's or an insider's financial condition; or (B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

2. 11 U.S.C. § 523(a)(2)(B)(i) requires that the written statement concern the debtor's or an insider's financial condition. Under 11 U.S.C. § 101(25)(A)(ii), if the debtor is an individual, an "insider" would include a partnership in which the debtor is a general partner. Myron Anderson was a general partner in Country Wide Tire, according to the partnership agreement. The Profit and Loss Statement and the

Financial Statements both deal with the financial condition of the partnership, an insider in this case, and so § 523(a)(2)(B) is applicable.

3. Two other written statements concerning the partnership's financial condition and an inventory list were offered into evidence by the Plaintiff. There was no testimony regarding when the inventory list was submitted to the Bank, but Dencklau admitted it was not inaccurate and the Bank was not questioning it. Financial reports of Country Wide Tire dated June 6, 1979 (Plaintiff's Exhibit 27) and June 7, 1979, (Plaintiff's Exhibit 26) indicating the partnership's income and expenses, respectively, for April and May of 1979, were offered and admitted subject to the Defendant's objections on the grounds of relevancy under Federal Rule of Evidence 401. That Rule provides that the definition of relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable ..." The Court finds that these two writ-

Each of the four elements of § 523(a)(2)(B) must be proven by the creditor by clear and convincing evidence. 3 *Collier on Bankruptcy* ¶ 523.09 (15th ed. 1982), *In re Tomeo*, 1 B.R. 673, 677, (Bkrtcy. E.D.Pa.1979). The Court has already noted that the statements in question here—*i.e.*, the profit and loss statement of February 5, 1979, and the financial statement of March 27, 1979—concern the financial condition of the partnership. The remaining elements, the material falsity, the reasonableness of the reliance, and the intent of the Debtor to deceive the Bank must each be proven by the creditor in order for the debt to be declared nondischargeable.

## I. *Intent to Deceive*

█ The Bank must prove that the Debtor caused the false financial statement to be made with the intent to deceive the Bank. 11 U.S.C. § 523(a)(2)(B)(iv). This phrase is generally interpreted to mean that the statement was knowingly or intentionally false, or was made under such reckless or negligent circumstances that the debtor should have known it to be false. *See*, 3 *Collier on Bankruptcy* ¶ 523.09[5][b] (15th ed.). Proving the intent of the debtor places a substantial burden on the party claiming the debt should not be discharged.

█ The question the Court must address is whether an "innocent" partner can be held liable for a materially false financial statement given by the debtor's partner to obtain credit for the business, and whether that partner's intent to deceive can be imputed to the debtor.

Originally, § 14 of the Bankruptcy Act of 1898, (hereinafter referred to as "the Act") as amended in 1903, provided that the bankrupt would be denied a discharge from *all* debts if that individual had received or re-

newed credit on the basis of a written, materially false financial statement. To alleviate the harsh results of this provision, § 14 was amended in 1960 to provide that only those debtors who gave written false financial statements in the course of operation of a business would be denied a discharge *in toto*. At the same time, § 17 of the Act was amended to provide that the use of a false financial statement in the nonbusiness context would result in the nondischargeability of that debt only. *See*, 1A *Collier on Bankruptcy*, ¶¶ 14.01[3], [4.4], 17.01[3.3], (14th ed. 1978).

Most of the early cases under the Act focused on whether the statements of one partner may be imputed to the bankrupt partner to prevent that partner's discharge in bankruptcy. These cases generally distinguished between the bankrupt's *right* to a discharge and the *effect* of the discharge. *Frank v. Michigan Paper Co.*, 179 F.2d 776, 779 (4th Cir.1910). The early courts generally would not impute the fraudulent conduct of a partner to the "innocent" bankrupt partner to deny the bankrupt a discharge. *See In re Lovich*, 117 F.2d 612 (2nd Cir.1941) (if false statement made by agent, additional factors must exist indicating the bankrupt knew of, or acquiesced in, the statement for the court to deny the bankrupt's discharge); and *Hardie v. Swafford Bros. Dry Good Co.*, 165 F. 588 (5th Cir. 1908) (fraud of one partner will not be imputed to an honest, innocent partner to bar his discharge so long as the innocent partner did not participate in and had no knowledge of the fraudulent act.) The courts did, however, usually in *dicta*, indicate that even though the bankrupt partner would be granted the discharge, the *effect* of the discharge may be such that the bankrupt would not be discharged from liability on the debt owed to the defrauded creditor.

---

ten statements that concern the partnership's financial condition are relevant to the issue of whether the debtor obtained credit from the bank through the use of false financial statements. The debtor's objections shall therefore be overruled and the evidence admitted. The Court also finds that there was no further testimony at trial regarding the truth or falsity of these statements, or whether the bank relied on

them in extending or renewing the defendant's credit. Therefore the Court concludes that the two financial reports of June 6, 1979, and June 7, 1979, are not materially false financial statements relied upon by the creditor in renewing or extending credit to the defendant or to the partnership, and shall not be considered further in this discussion.

*Frank v. Michigan Paper Co.,* 179 F.2d at 781, and *Lovich,* 117 F.2d at 614. None of these earlier cases are directly on point in the matter now before the Court due to the changes in the bankruptcy law put into effect by the Bankruptcy Reform Act of 1978 (hereinafter "The Code").

Few courts have been faced with the question of whether a debt will be discharged in the bankruptcy of one partner, when the debt was created by the fraudulent actions of another partner and would not be discharged in that partner's bankruptcy case under the Code.[4] One court noted that the objecting creditor has a heavy burden to prove that the debtor acted with the intent to deceive. "However, current law would seem at a minimum to support holding a debtor liable where he had seen the financial statement and the errors were such that he knew or should have known of their falsity. The debtor's failure to notify the creditors of the falsity . . . would be evidence of an intent to deceive." *In the Matter of Gray,* 22 B.R. 676, 680 (Bkrtcy.W.D.Wis.1982).

This Court finds the reasoning of *Gray* persuasive in this instance. One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from the oppressive burden of his or her debts. *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). It is in this light that the legislative history of the 1978 Bankruptcy Code indicates that the basis for the exceptions to discharge under § 523(a) is to protect the creditor from the dishonest and fraudulent debtor. H.R.Rep. No. 595, 95th Cong. 1st Sess. 130, 131 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. The clear legislative policy of discharging the honest debtor would be negated by imputing the deceptive intent of one partner to an honest, innocent debtor partner.

4. One bankruptcy court stated, without further discussion, that this "question, however, appears to be fairly well settled and to the effect that a debt arising from the obtaining of goods by false pretenses of a partner, acting for the partnership, constitutes a claim which is not dischargeable in bankruptcy as to the misbe-

Anderson had seen the financial statement before it was given to the bank, but he was not at that time in a position to know that the information was false. In addition, Anderson informed the bank of the business' true financial picture after he himself first discovered the situation.

In addition, the testimony at trial indicated that Anderson's presence in the business was the strength of Country Wide Tire, and the suppliers did business with the partnership on the strength of Anderson's honesty and integrity. This testimony by the Bank's own witnesses is indicative of Anderson's reputation for honesty among his other creditors.

These facts indicate that Anderson took no part in intentionally submitting a false financial statement to the Bank for the purposes of obtaining credit. Further, any intent to deceive the Bank on behalf of Gary Christeson ought not be imputed to Anderson, the "innocent" partner. Throughout his course of dealing with the Bank, Anderson was honest and forthright and had no reason to believe that his partner was deceiving him or the Bank. The Bank has not proven that Anderson intentionally deceived the Bank by submitting false financial statements, and any intent to deceive on the part of Christeson will not be imputed to Anderson to except the Bank's claim from the discharge granted to Anderson.

II. *Materially False*

■ In order to succeed on its objection to discharge, the Bank must also prove that the financial statements were materially false. "Materially false" should be construed to mean an important or substantial untruth. *In re Tomeo,* 1 B.R. 673, (Bkrtcy. E.D.Pa.1979). This Court has held "that the omission of a substantial item of liabili-

having partner, the partnership, or an innocent partner." *In re Warren,* 7 B.R. 571 (Bkrtcy.N. D.Ala.1980) (citing *Frank v. Michigan Paper Co.,* and other cases.)

The cursory analysis of *Warren* was rejected in *In the Matter of Gray,* 22 B.R. 676 (Bkrtcy. W.D.Wis.1982).

ty upon a statement calling for a listing of all liabilities and requiring the amount of total liabilities and net worth to be expressly set forth makes the statement a materially false one." *In re Schwarting,* B77–208, B77–209, Complaint Nos. 402 and 403, Slip op. at 10 (Bkrtcy.N.D.Iowa, Sept. 3, 1980), aff'd. 671 F.2d 1192 (8th Cir.1982).

■ There seems to be no dispute that the financial statement of March 29, 1979, contained substantially untrue statements. $12,050 is listed on the statement as the partnership's liabilities for accounts payable for merchandise not due. According to testimony at trial and exhibits admitted, this amount is substantially less than what was actually owed to suppliers on or about March 29, 1979. The invoices of M and W Tire, Hanson Tire Service, and Bob's Tire Service, indicate that the approximate amounts owed to these three suppliers exceeded $44,900.00 immediately before the financial statement was signed.[5] The discrepancy between the amounts actually owed and the amount listed on the financial statement totals at least $32,915.00. This discrepancy is more substantial in context of the entire financial statement, which lists the partnership's "net worth" (the total assets of $174,690.00 minus total liabilities of $112,050.00) as $62,640.00. It would be difficult to conclude that such a discrepancy is anything but substantially untrue or "materially false."[6]

In addition, after Anderson took over handling the partnership affairs sometime in May of 1979, he became aware that the partnership had a considerable amount of inventory on hand for which the suppliers had not yet been paid, and he informed the Bank of this fact in June or July of 1979.

The inaccuracy of the financial statement has therefore been admitted and the Court is of the opinion that the discrepancy of approximately $33,000.00 is materially false.

The Court, however, can find no way in which the profit and loss statement of February 5, 1979, is materially false. No testimony was presented at trial indicating in what respect it might be false. At the time the statement was prepared by the partnership's accounting firm, Anderson had no reason to believe any information on it was false; he further testified that he still believed the statement to be accurate. In addition, the profit and loss statement was prepared for purposes of completing the partnership tax returns. An examination of the 1978 tax return (Plaintiff's Exhibit 25) indicates that the figures generally correspond to those on the profit and loss statement. The only discrepancies between the statement and the tax return are that the profit and loss statement does not account for depreciation of $2,298.00 taken for tax purposes and that the profit and loss statement actually overstated some of the partnership's vehicle expenses by approximately $300.00. The Court is of the opinion that these are minor discrepancies and do not rise to the level of a material or substantial falsity.

There was no testimony at trial regarding the accuracy of the profit and loss statement other than the Debtor's assertions that he believed the statement were accurately prepared. The Court must therefore conclude that the profit and loss statement was not a materially false financial statement for purposes of 11 U.S.C. § 523(a)(2)(B)(i).

---

5. On or about the time the financial statement was signed by the two partners, the amounts owed these three suppliers were as follows: approximately $16,122.38 to M & W Tire as of March 20, 1979; $14,194.81 to Hanson Tire as of March 22, 1979; and $14,648.17 to Bob's Tire Service as of March 27, 1979. This amounts to $44,965.36 owed to these three suppliers.

6. It is very possible that Country Wide Tire owed substantially more money to suppliers other than the three noted above. On his bank-

ruptcy schedules, Anderson listed thirteen other creditors with claims incurred during 1978–1979. At the time of filing, he owed these thirteen suppliers approximately $13,950.00 for tires, wheels, rims and other supplies provided between 1978 and 1979. The Court has no way to determine how much, if anything, was actually owed to any of these other suppliers on March 27, 1979, and can only assume that some additional amounts may have also been owing.

## III. *Reasonable Reliance*

The next requirement which must be proven is that the creditor relied on the financial statement in extending the credit and that such reliance was reasonable.

■ The Court finds that there was no reasonable reliance on any false written financial statement in any of the transactions between Anderson and the Bank. There were at least nine loans which were made before the Bank received any written statements regarding the partnership's financial condition.[7] Therefore there could not have been any reliance by the Bank on any false financial statements regarding these nine loans.

### A. *Reliance Upon the Profit and Loss Statement*

The Court has already found that the profit and loss statement given on February 5, 1979, was not materially false nor given with the intent to deceive, so any reliance by the Bank on that statement would be immaterial at this point. Assuming, *arguendo*, that the profit and loss statement was materially false and made with the requisite intent, the Court would nevertheless conclude that the Bank did not reasonably rely upon it. There was no direct evidence presented to indicate that the profit and loss statement was relied upon at all in the Bank's decision to extend credit to the partnership on the two occasions. In addition, the Bank had already loaned the partnership approximately $77,000, based upon the partners' oral assertions of what their business was worth and upon the Bank's visual inspection of the premises. The Court therefore finds that the Bank did not rely on the profit and loss statement in extending credit to the partnership. If the Bank did, however, rely on the profit and loss statement, the Court nevertheless finds that any such reliance was unreasonable under these circumstances.

### B. *Reliance Upon Financial Statement*

■ Only one loan was entered into between the time the financial statement was given to the Bank and the time the Bank learned of its falsity. This was Note No. 2246, signed on May 8, 1979, which cancelled and renewed three of the partnership's overdue notes. Dencklau testified at trial that the Bank would not have extended these notes if it had been aware of the actual amounts owing to suppliers at that time, and would instead have realized on its security. Accepting Dencklau's statement that the admittedly false financial statement was relied upon in refinancing the three notes involved herein, the Court must now examine the reasonableness of that reliance.

No fresh cash was issued to the business at any time after the financial statement was given to the Bank. The legislative history, however, suggests that an amount which is rolled over into a new loan, as well as any fresh cash advanced, may be declared nondischargeable. H.R.Rep. No. 595, 95th Cong., 1st Sess., 129 (1977), U.S.Code Cong. & Admin.News 1978, p. 6090.

> If an initial loan is made subject to a false financial statement and new money is advanced under a subsequent loan that is not made under conditions of fraud or false pretenses, then only the initial amount of the loan made on the original financial statement is invalidated and excepted from discharge. · On the other hand where the original financial statement is made under nonfraudulent conditions and the entire loan in addition to new money is advanced under a subsequent false financial statement, the entire loan is made under fraudulent conditions. This rule is sound as a matter of policy because the creditor relies to his detriment with respect to the entire amount advanced under the false financial statement.

H.R.Rep. No. 595, *supra,* pp. 129–130, U.S. Code Cong. & Admin.News 1978, pp. 6090–6091.

Two of the three original notes were advanced before the Bank received either the Profit and Loss Statement or the Financial

---

7. Only four of these nine notes were in evidence at trial.

Statement, so were made without any reliance on any written financial statements; the third loan was advanced after the Bank received the Profit and Loss Statement, but the Court has held that no reliance by the Bank on that statement has been shown. The three notes involved in this renewal were all past due at the time the renewal was entered into, yet the Bank had taken no action on any of the notes. In addition, the Bank could have made its own independent check of the partnership's financial condition.[8] The Court therefore finds that any reliance by the Bank on the March 27, 1979, financial statement was unreasonable.

There is one additional factor which the Court must also examine in this discussion of reasonable reliance. All of the partnership's loans which were outstanding were renewed on September 14, 1979, and September 18, 1979. Note No. 2246, (the renewal mentioned above,) and Note No. 1928, dated February 14, 1979, (which advanced new money for inventory) were rewritten on September 14, 1979, into Loan No. 2676 for a face value of $39,695.83. Loan No. 989, (a renewal which also advanced new money) and Loan No. 866, both of which were entered into prior to the delivery of the profit and loss statement, were rewritten on September 18, 1979, into Note No. 2694, for a face value of $41,142.08. Both of these renewals were made at a time when the Bank knew the financial statement was false.

In order to determine the effect of these renewals, the Court must examine each renewed note independently. Note No. 2694, dated September 18, 1979, renewed two notes, both of which were entered into before any financial statements had been obtained by the Bank. The original loans therefore had been incurred under non-fraudulent conditions and the renewal of those sums was made at a time when the Bank knew that the financial statement was false. None of the sums involved in

any of these three loans, either the original loans or the renewal, were thus incurred in reliance upon any financial statements.

Renewal Note No. 2676, dated September 14, 1979, is not as easily disposed of. This note renewed two notes as well; Note no. 1928, (under which the Bank advanced $20,000.00 of new money to the partnership after the profit and loss statement had been delivered to the Bank, but before the financial statement was made,) and Note No. 2246 (which was the renewal entered into after the false financial statement had been given to the Bank.) The Court has already found that the Bank did not reasonably rely on any of the written financial statements in writing either of these two notes. If this is correct, then these two notes (1928 and 2246) were entered into under non-fraudulent conditions, and were subsequently renewed at a time when the Bank admittedly had not relied upon the financial statements.

The Court notes, however, that even if the two previous notes had been entered into under fraudulent conditions, the rewritten note might still be declared dischargeable in this situation. Carl Dencklau admitted at trial that the Bank did not rely on the financial statement in refinancing the notes in September of 1979. At the time of these renewals, the Bank had learned of the partnership's true financial situation and Dencklau noted that the Bank was simply trying to make the best of a bad situation. It is difficult for the Court to conceive how the Bank can claim it actually relied on the financial statement at any time in light of the fact that it loaned money to the business before any financial statement was received, and renewed those loans after learning the financial statement contained false representations.

This scenario urged upon the Court by the Bank parallels the problems which developed in the consumer finance industry

---

8. Additional sources of financial information are often available to creditors to verify the accuracy of the debtor's financial statement. H.R.Rep. No. 595, 95th Cong., 1st Sess., 131, (1977). Some courts have held that a creditor

has a *duty* to make a reasonable check of other sources and should not rely solely upon the financial statement. *See, In re Breen,* 13 B.R. 965 (Bkrtcy.S.D.Ohio, 1981). This Court, however, does not impose such a duty.

under prior bankruptcy law. H.R.Rep. 595, 95th Cong. 1st Sess. 130–131 (1977). Before the Code was enacted, it became common for lenders to take financial statements from their customers after telling the customer not to be concerned if they did not list all information accurately. The lender was then in an excellent bargaining position if that debtor subsequently filed bankruptcy; the lender simply could threaten the debtor with litigation to determine the dischargeability of that debt based upon the false financial statement. This appears to be very close to what happened in this case. The Bank loaned money before any financial statement was given. After the Bank had lent approximately $77,000.00 to the partnership, written financial data was requested from the partners, but the Bank continued to extend and renew credit to them without such information. The Bank even renewed the partnership's credit after learning that the financial statement was false. The Court therefore concludes that any reliance claimed by the Bank upon any of the financial statements given by the partnership was totally unreasonable.

### IV. *Deficiency Balance Agreement*

The bank embarked upon one final endeavor to save itself in its dealings with Country Wide Tire. On June 18, 1980, the bank entered into a "Deficiency Balance Agreement" with Myron Anderson. This agreement provided as follows:

> I, Myron Anderson, hereby agree with the Alden State Bank of Alden, Iowa, that I will agree to pay the Alden State Bank, $50,000.00 plus 9 percent interest from June 18, 1980, to settle my indebtedness left after the sale of my collateral of my business, Country Wide Tire. I also hereby state that it will be necessary for me to file a Bankruptcy petition because of my excessive indebtedness but I also hereby agree that $50,000.00 which I have agreed to pay the Alden State Bank shall not be Discharged in my Bankruptcy petition and I also hereby agree to reaffirm the above mentioned indebtedness in order to protect the Alden State Bank's position as stated above.

The agreement was signed by Myron Anderson. Also on June 18, 1980, Anderson signed yet another note to the bank, in the amount of $50,000.00 at an annual interest rate of 9 percent. This note was identified for the purpose of "Settlement on Notes."

The Deficiency Balance Agreement appears to create a modification of the original agreements between the parties, as evidenced by the various notes. Such a modification may be characterized by one of two distinct legal theories: an accord or a substituted contract. *Sergeant v. Leonard,* 312 N.W.2d 541 (Iowa, 1981). If the parties intended that the new agreement itself be accepted as satisfaction for the original obligation, thus discharging the original obligation, the new agreement is a substituted contract. Restatement(2d) of Contracts § 279 (1981), *Sergeant,* 312 N.W.2d at 546. If the parties intended that the original contract would remain in existence and would only be discharged upon performance of the new agreement, the new agreement is an accord. Restatement(2d) of Contracts § 281 (1981), *Sergeant,* 312 N.W.2d at 545.

If the Court considers this Deficiency Balance Agreement a substituted contract, the only debt owed by the Debtor to the bank would be the $50,000.00 evidenced by the note dated June 18, 1980. This debt would nevertheless be a dischargeable debt. The Bank cannot claim that it relied in any way upon the March 27, 1979, Financial Statement in entering into this loan. The Court has already held that reliance, if any, upon the Financial Statement for the September, 1979, renewals was unreasonable in this situation, and the same analysis applies to the June 18, 1980, agreement. In addition, the financial statement was over one year old at the time this agreement was entered into and such a period of time renders any claimed reliance suspect. Even though the Debtor did not reaffirm its debt to the bank according to the agreement, this Court cannot find that the Debtor's behavior amounted to actual fraud or false pretenses or representations. The agreement to reaffirm the debt is an unenforceable promise, which, by itself, does not constitute fraud.

The Court is of the opinion, however, that this Deficiency Balance Agreement is simply an accord. The intent of the parties seems quite simply that if the Debtor performed its part of the agreement—*i.e.,* not discharging and reaffirming its debt to the bank—the bank would reduce the debt to $50,000.00. Since Anderson did not satisfy his obligation under the agreement, the original contract notes between the parties are not discharged or cancelled, and they indicate the amount of the indebtedness owed to the bank. This finding is supported by the fact that the notes outstanding at the time of the Deficiency Balance Agreement were not marked "Paid" or "Cancelled by Renewal" as other cancelled and rewritten notes had been. This evidences an intention by the parties that the original notes would not be cancelled until performance of the Debtor's obligations under the Deficiency Balance Agreement.

Under this analysis, the Deficiency Balance Agreement would have no effect and the notes outstanding at the time it was entered into would nevertheless be discharged under the Court's prior analysis.