In re McLAUGHLIN FARMS, INC.,
Bru–Bet Arabians, Inc. and
Bru–Bet Big Sky Corp., Debtors.

Habbo FOKKENA, Trustee, Plaintiff,

v.

FIRST NATIONAL BANK OF
GLIDDEN, Defendant.

Bankruptcy Nos. X86–02586F,
X88–00180F and X88–00179F.
Adv. No. X89–0106F.

United States Bankruptcy Court,
N.D. Iowa.

Aug. 22, 1990.

Thomas P. Peffer, Cedar Rapids, Iowa, for plaintiff/trustee.

James Pray, Des Moines, Iowa, for defendant.

WILLIAM L. EDMONDS, Bankruptcy Judge.

Habbo Fokkena is the trustee in these consolidated liquidation cases. In this adversary proceeding, he seeks a determination that First National Bank of Glidden (BANK) has no security interest in the proceeds of the sale of certain estate property. Trial was held in Fort Dodge, Iowa on January 19, 1990. Having considered the evidence and the arguments of the parties, the court now issues this decision which includes findings of fact and conclusions of law as required by Bankr.R. 7052.

## PROCEDURAL FACTS

The parties, in their joint pre-trial statement, have stipulated to facts relevant to the procedural history of this adversary proceeding. The court adopts them as findings. The references to attachments

have been deleted. The procedural history of the case follows:

This adversary proceeding is brought pursuant to Bankruptcy Rules 7001 and Sections 502 and 506 of Title 11, United States Code. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(K).

On November 17, 1986, a Petition for Relief under Chapter 11, Title 11, United States Code, was filed by McLaughlin Farms, Inc.

On January 29, 1988, after hearing on Motion to Convert filed by the Internal Revenue Service, the case was converted to a Chapter 7 proceeding.

On February 4, 1988, a Petition for Relief under Chapter 7, Title 11, United States Code, was filed by Bru–Bet Arabians, Inc. and Bru–Bet Big Sky Corporation.

Plaintiff is the duly appointed, qualified and acting Trustee in each of the said bankruptcy cases.

The [Bankruptcy] Court ruled on March 1, 1988 in Adversary No. 1–88–0018F and in each of the above-referenced bankruptcies, that, as far as the McLaughlins and all parties before the Court were concerned, the three corporations were mere shells and that they were to be treated as one and the same corporation.

On March 18, 1988 the Trustee filed a notice of intent to sell certain personal property free and clear of liens. The property consisted of farm machinery, tools on hand, some office furniture and equipment and other miscellaneous personal property.

\* \* \* \* \* \*

On March 23, 1988 the Trustee filed a Notice of Trustee's Amended Application for an Order Authorizing the Sale of Property Free and Clear of Liens.

\* \* \* \* \* \*

On March 30, 1988 First National Bank of Glidden, Iowa filed a Contingent Objection to the Trustee's Amended Application for an order Authorizing the Sale of Property Free and Clear of Liens. In the Contingent Objection, the First National Bank of Glidden asserted a security interest in the personal property. The Bank did not object to the sale of the personal property, but requested that the proceeds be placed in an escrow account and that the Bank's claim to said funds be adjudicated upon notice and hearing.

\* \* \* \* \* \*

On April 16, 1988 an auction sale for the personal property, including machinery, equipment, tools, office equipment and other miscellaneous property was completed at Rural Route, Glidden, Iowa. The Trustee's Report of Iowa Farm Machinery and Equipment Sale was served on May 9, 1988 and filed shortly thereafter.[1]

\* \* \* \* \* \*

### FINDINGS OF FACT

As part of their Pre–Trial Statement, Trustee and Bank have stipulated to numerous facts relevant to the adversary proceeding. The court accepts the stipulation and now sets out these facts verbatim. The court's only additions to the stipulation are the references in brackets to trial ex-

---

1. According to the trustee's report of sale, he received $104,471.50 for the auction sale of "certain farm personal property, including machinery, equipment, tools, office equipment, and other miscellaneous property." After the payment of expenses, the net proceeds of sale, $85,-010.28, were deposited in the First National Bank of Waterloo pending further court order. The disputed security agreements in this case cover "all equipment including but not limited to all farm equipment, tractors, machinery and implements, all farm products including but not limited to crops, livestock and supplies used or produced in farming operations, all contract rights and accounts, and in additions, and in accessions and substitutions thereto; and all products and proceeds thereof including an assignment of all government farm program proceeds including grain payments in kind." Exhibits 7 and 8. The court is not able to determine from the evidence submitted during trial or from the parties pre-trial stipulation, whether the sale by the trustee included items not covered by the security interest. Therefore the court's determination in this case will relate to the efficacy of the security agreement, but will not attempt to determine whether any particular item sold at the sale was the subject of the security agreement.

hibit numbers for those exhibits referred to in the stipulation.

1. As of July 1983 neither Bru–Bet Arabians, Inc., nor McLaughlin Farms, Inc., nor Bruce McLaughlin, nor John McLaughlin owed any money to First National Bank of Glidden.

2. In June or July of 1983, Bruce McLaughlin, John McLaughlin and Meadowlark Lemon (the latter of Globetrotter basketball fame) approached the Omaha National Bank and/or First National Bank of Glidden with regard to loaning Meadowlark Lemon the sum of $600,000.00 for the purchase of twelve (12) Arabian horses.

3. On or about July 14, 1983 Meadowlark Lemon, in exchange for the sum of $600,000.00, executed and delivered a promissory note (Deposition Exhibit 3) [Trial Exhibit 3] to First National Bank of Glidden in the amount of $600,000.00.

4. The Omaha National Bank agreed to participate in the Meadowlark Lemon loan to the extent of $300,000.00, and pursuant to a participation certificate, the Omaha National Bank deposited $300,000.00 in the account of First National Bank of Glidden.

5. As part of the Meadowlark Lemon loan transaction, on or about July 13, 1983 Meadowlark Lemon executed an agricultural security agreement (Deposition Exhibit 9) [Trial Exhibit 9] granting the First National Bank of Glidden a security interest in:

"All equipment including but not limited to all farm equipment, tractors, machinery and implements, all farm products including but not limited to crops, livestock and supplies used or produced in farming operations, all contract rights, and accounts, and in addition, and in accessions and substitutions thereto; and all products and proceeds thereof including an assignment of all government farm program proceeds including grain payments in kind. This is a purchase price security agreement in the below listed equipment and livestock.

This is a purchase price security interest in the following Arabian Horses:

G.G. Jabasket 197630;
Bru–Bet Nerissa 116811;
Mc Julie Ann 203403;
St. High Labelle 180258;
Bru–Bet Faun 119709;
MC Jubilee 130307;
Sakolee 87451;
Brusally Czesemah 49193;
Ferbaska 221638;
Seramenka 78274;
Barsyna 94889;
Shar Mar Ferlana 141985.

The above registration numbers are the numbers as issued by the Arabian Horse Registry of America, Inc."

6. As part of the Meadowlark Lemon loan transaction, on or about July 13, 1983 Meadowlark Lemon executed an agricultural security agreement (Deposition Exhibit 10) [Trial Exhibit 10] granting the First National Bank of Glidden a security interest in:

"All equipment including but not limited to all farm equipment, tractors, machinery and implements, all farm products including but not limited to crops, livestock and supplies used or produced in farming operations, all contract rights, and accounts, and in addition, and in accessions and substitutions thereto; and all products and proceeds thereof including an assignment of all government farm program proceeds including grain payments in kind. This is a purchase price security agreement in the below listed equipment and livestock.

This is a purchase price security interest in the following Arabian horses:
G.G. Jabasket 197630;
Bru–Bet Nerissa 116811;
Mc Julie Ann 203403;
St. High Labelle 180258;
Bru–Bet Faun 119709;
MC Jubilee 130307;
Sakolee 87451;
Brusally Czesemah 49193;
Ferbaska 221638;
Seramenka 78274;
Barsyna 94889;

Shar Mar Ferlana 141985.

7. As part of the Meadowlark Lemon loan transaction, on or about July 15, 1983 a UCC financing statement executed by Meadowlark Lemon was filed with the Iowa Secretary of State (Deposition Exhibit 11) [Trial Exhibit 11] stating on its face that it covered:

"Arabian Horses and increase from same".

8. As part of the Meadowlark Lemon loan transaction, on or about July 25, 1983 a UCC financing statement executed by Meadowlark Lemon was filed with the Iowa Secretary of State (Deposition Exhibit 12) [Trial Exhibit 12] stating on its face that it covered:

"Arabian horses and increase from same including:

G.G. Jabasket 197630;

Bru–Bet Nerissa 116811;

Mc Julie Ann 203403;

St. High Labelle 180258;

Bru–Bet Faun 119709;

MC Jubilee 130307;

Sakolee 87451;

Brusally Czesemah 49193;

Ferbaska 221638;

Seramenka 78274;

Barsyna 94889;

Shar Mar Ferlana 141985.

The above registration numbers are the numbers as issued by the Arabian Horse Registry of America, Inc."

9. As a part of the Meadowlark Lemon loan transaction, on or about July 14, 1983 McLaughlin Farms, Inc., Bru–Bet Arabians, Inc., Bruce McLaughlin and John H. McLaughlin executed and delivered two Guaranties (Deposition Exhibits 4 and 5) [Trial Exhibits 4 and 5] guarantying payment of the Meadowlark Lemon promissory note to First National Bank of Glidden.

10. As a part of the Meadowlark Lemon loan transaction, on or about July 14, 1983 McLaughlin Farms, Bru–Bet Arabians, Bruce McLaughlin and John McLaughlin executed an agricultural security agreement (Deposition Exhibit 7) [Trial Exhibit 7] granting the First Na-

tional Bank of Glidden a security interest in:

"All equipment including but not limited to all farm equipment, tractors, machinery and implements, all farm products including but not limited to crops, livestock and supplies used or produced in farming operations, all contract rights, and accounts, and any additions, and any accessions and substitutions thereto; and all products and proceeds thereof including an assignment of all government farm program proceeds including grain payments in kind. This is a renewal of a purchase price security agreement in the below-listed equipment and livestock.

including Arabian Horses."

11. As part of the Meadowlark Lemon loan transaction, on or about July 14, 1983 McLaughlin Farms, Bru–Bet Arabians, Bruce McLaughlin and John McLaughlin executed an agricultural security agreement (Deposition Exhibit 8) [Trial Exhibit 8] granting the First National Bank of Glidden a security interest in:

"All equipment including but not limited to all farm equipment, tractors, machinery and implements, all farm products including but not limited to crops, livestock and supplies used or produced in farming operations, all contract rights, and accounts, and any additions, and any accessions and substitutions thereto; and all products and proceeds thereof including an assignment of all government farm program proceeds including grain payments in kind.

This security interest includes 1st security interest in all Arabian horses including G.G. Jabaska # 100335; High Hopes # 61384; and The Chief Justice # 132112 all Arabian Stallions. These numbers are the numbers as issued by the Arabian Horse Registry of America, Inc."

12. As a part of the Meadowlark Lemon loan transaction, on or about July 15, 1983 a UCC financing statement executed by McLaughlin Farms, Bruce McLaughlin and John McLaughlin was

filed with the Iowa Secretary of State (Deposition Exhibit 13) [Trial Exhibit 13] stating on its face that it covered:

"All equipment, all farm products including but not limited to crops, livestock, supplies used or produced in farming operations, contract rights, and accounts. Also including Arabian Horses and increase from the same."

13. As a part of the Meadowlark Lemon loan transaction, on or about July 25, 1983 a UCC financing statement executed by McLaughlin Farms, Bruce McLaughlin and John McLaughlin was filed with the Iowa Secretary of State (Deposition Exhibit 14) [Trial Exhibit 14] stating on its face that it covered:

"All equipment, all farm products including but not limited to crops, livestock, supplies used or produced in farming operations, contract rights, and accounts. Also including all Arabian Horses including G.G. Jabaska # 100335; High Hopes # 61384; and The Chief Justice # 132112. These numbers are the numbers issued by the American Horse Registry of America, Inc."

14. Bob Van Horn will testify that it was the First National Bank of Glidden's specific intent to include as collateral for the Meadowlark Lemon loan the equipment and farm machinery owned by McLaughlin Farms, Inc., Bru–Bet Arabians, Inc., John McLaughlin and/or Bruce McLaughlin.

15. On July 14, 1983 Bob Van Horn, then-president of First National Bank of Glidden sent the Omaha National Bank a letter (Deposition Exhibit 1) [Trial Exhibit 1] regarding the Meadowlark Lemon loan, enclosing a copy of the documents related to that loan.

16. On or about February 16, 1984, McLaughlin Farms, Inc., Bru–Bet Arabians, Inc., John McLaughlin and/or Bruce McLaughlin paid $300,000.00, plus interest of $23,704.11, to pay off that portion of the Meadowlark Lemon loan in which Omaha National Bank had been participating.

17. As a part of the transactions involved in the Meadowlark Lemon loan, on February 21, 1984 a UCC partial release executed by First National Bank of Glidden and dated February 16, 1984 was filed with the Iowa Secretary of State (Deposition Exhibit 18) [Trial Exhibit 18], partially releasing the financing statement filed July 15, 1983 (Deposition Exhibit 13) [Trial Exhibit 13] and stating that on its face that it:

"1. release security interest in Arabing (sic) Horses and all increase from same

all other property still covered"

This partial release was filed as a result of the February 16, 1984 payment by the McLaughlins of the sum of $300,000.00, plus interest.

18. As a part of the transactions involved in the Meadowlark Lemon loan, on or about February 21, 1984 a UCC partial release and amendment executed by First National Bank of Glidden and dated February 16, 1984 was filed with the Iowa Secretary of State (Deposition Exhibit 19) [Trial Exhibit 19], partially releasing the financing statement filed July 25, 1983 (Deposition Exhibit 14) [Trial Exhibit 14], and stating on its face:

"release all liens on all Arabian Horses including G.G. Jabask # 100335; High Hopes # 61384; and The Chief Justice # 132112. These numbers are the numbers issued by the American Horse Registry of America, Inc.

financing statement remains in effect for all other security".

This partial release was also filed as a result of the February 16, 1984 payment by the McLaughlins of $300,000.00, plus interest.

19. When the February 16, 1984 payment of $300,000.00, plus interest, was paid, the registration papers for 9 of the 12 horses originally purchased by Meadowlark Lemon were returned to the McLaughlins by Omaha National Bank and/or First National Bank of Glidden. First National Bank of Glidden intended to release its security interest in those 9 horses, but no release was ever filed of record.

20. On June 6, 1984 Robert Van Horn, then-president of First National Bank of Glidden, sent Meadowlark Lemon a demand notice (Deposition Exhibit 20) [Trial Exhibit 20] indicating that the balance of the promissory note would be renewed upon payment of $100,000.00 principal and $42,000.00 interest.

21. On or about August 24, 1984 the amount due and owing from Meadowlark Lemon, McLaughlin Farms, Inc., Bru-Bet Arabians, Inc., Bruce McLaughlin and John H. McLaughlin was the principal sum of $300,000.00 (First National Bank of Glidden's portion of the original $600,000.00 loan), plus interest as provided in the promissory note.

22. On August 24, 1984 First National Bank of Glidden filed a Petition (Deposition Exhibit 21) [Trial Exhibit 21] against McLaughlin Farms, Inc., Bru-Bet Arabians, Inc., Bruce McLaughlin, John H. McLaughlin and Mary Ann E. McLaughlin in the Iowa District Court for Carroll County, No. 28497. The Carroll County lawsuit alleged that the defendants were liable under the respective Guaranties of the Meadowlark Lemon loan transaction in the sum of $300,-000.00, plus interest and reasonable attorney fees, due to the default under the promissory note executed by Meadowlark Lemon. The transactions which were the subject of the Petition were the transactions involved with the Meadowlark Lemon loan.

23. By Amended and Substituted Petition filed April 23, 1985, Meadowlark Lemon was named as a defendant in Carroll County No. 28497. A default judgment in the amount of $300,000.00, plus interest, was obtained against Meadowlark Lemon on March 20, 1986. Meadowlark Lemon later filed bankruptcy in California.

24. After five days of trial of the main action and of a counterclaim filed by defendants, the parties, with the exception of Meadowlark Lemon, executed a Settlement Agreement on October 29, 1986. (Deposition Exhibit 22) [Trial Exhibit 22].

25. The Settlement Agreement dated October 29, 1986 provided, in part, as follows:

"5. The parties agree to dismiss any and all claims they are making in this action and provide releases to the other party. Each party shall pay their own court costs. Furthermore, the parties agree that any and all claims they now have against the other, their officers, employees, or agents, and any and all claims they might have in the future arising out of each and all the transactions subject to this suit are forever barred. The parties further agree that the only claim each may have against the other as to the transactions the subject of this suit shall be founded only in this settlement agreement document."

26. Pursuant to the terms of the Settlement Agreement, a Dismissal with Prejudice was filed by First National Bank of Glidden in Case No. 28497 on November 14, 1986 (Deposition Exhibit 23) [Trial Exhibit 23].

27. Pursuant to the terms of the Settlement Agreement, a Release on behalf of First National Bank of Glidden and in favor of McLaughlin Farms, Inc., Bru-Bet Arabians, Bruce McLaughlin, John H. McLaughlin and Mary Ann E. McLaughlin was signed on October 29, 1986. The Release, a copy of which is attached [Trial Exhibit 28], released the defendants:

"from any and all liability whatsoever, including all claims, demands, and causes of action of every nature affecting us or either of us jointly or severally, which we or either of us may have or ever claim to have by reason of: (b) any and all claims against the parties being released, their officers, employees, or agents, now held or which might arise in the future resulting from the transactions which are the subject matter of the lawsuit, No. 28497 on file in the Iowa District Court for Carroll County.

28. The Settlement Agreement provides that the Bank has a security inter-

est in horses currently claimed or owned by Meadowlark Lemon.

29. On October 21, 1987 First National Bank of Glidden filed a Petition for Replevin against Bru–Bet Arabians, Inc. in the Iowa District Court for Carroll County as CL No. 29959 (Deposition Exhibit 24) [Trial Exhibit 24]. The Petition for Replevin was an attempt by the First National Bank of Glidden to obtain possession of the 3 remaining Meadowlark Lemon horses.

30. Bru–Bet Arabians Inc. filed a Motion to Dismiss in CL No. 29959 (Deposition Exhibit 25) [Trial Exhibit 25] based upon the above quoted language from the October 29, 1986 Settlement Agreement. In Plaintiff's Resistance to Motion to Dismiss (Deposition Exhibit 26 [Trial Exhibit 26], counsel for First National Bank of Glidden stated, in relevant part, as follows:

"Defendant asserts that the language in the settlement agreement is dispositive of the issues now before this Court. However, the language quoted by defendant states that "the parties further agree that the only *claim* each may have against the other as to the transaction subject to this suit shall be founded only in the settlement agreement document." (emphasis supplied). The key word quoted above is "claim". This case instead concerns an action to replevin three Arabian horses owned by Meadowlark Lemon and, as such, does not constitute a claim against Bru–Bet Arabians, Inc. . . . "

31. First National Bank of Glidden subsequently recovered the proceeds of 2 of the 3 Meadowlark Lemon horses. One was Seramenka, for which the Bank received $3,536.00. The other was G.G. Jabasket, for which the Bank received $18,000.00.

32. The Settlement Agreement provides that the McLaughlins were to provide to the Bank Arabian horses having an appraised value of $250,000.00.

33. On February 9, 1987 First National Bank of Glidden filed a Petition (Deposition Exhibit 27) [Trial Exhibit 27] in the Iowa District Court for Carroll County as No. 29645. The action was filed against Bru–Bet Arabians, Inc., Bruce McLaughlin, John McLaughlin and Mary E. McLaughlin alleging a breach of the October 29, 1986 Settlement Agreement by the Defendants' failure to deliver to First National Bank of Glidden, free and clear of any and all liens, encumbrances, and claims, registered Arabian horses having an appraised value of $250,000.00. That action is still pending.

ADDITIONAL FINDINGS OF FACT

Each of the guaranties provided to Bank by McLaughlin Farms, Inc. states it is secured by a financing statement and security agreement. The security agreements (Exhibits 7 and 8) relate to the guaranties which were Exhibits 4 and 5. The court cannot determine from the evidence which security agreement relates to which guaranty or even if a particular relationship was intended. However, the court does not believe that such a determination is necessary to the outcome of the case. The agricultural security agreements are in the same form and include the following paragraph:

4. OBLIGATIONS SECURED—This Agreement is continuing until specifically terminated in writing by Bank and the security interest granted herein is given to secure the performance of the covenants and agreements herein set forth and the payment of the indebtedness evidenced by the promissory note(s) or other instruments executed by Debtor to the order of Bank and any other indebtedness of Debtor to Bank whether now existing or hereafter incurred, of every kind and character, direct or indirect, whether as maker, endorser, guarantor or surety and whether such indebtedness is from time to time reduced and thereafter increased or entirely extinguished and thereafter reincurred, including, without limitation, any sums advanced by Bank in the performance of Debtor's obligations hereunder. . . .

The forms of agreement also included the following sentence:

The rights and remedies herein conferred upon the Bank shall be cumulative and not alternative and shall be in addition to and not in substitution of or in derogation of rights and remedies conferred by the Uniform Commercial Code of Iowa, and other applicable laws.

Exhibits 7 and 8, page 2, paragraphs 11.

Although the loan to Meadowlark Lemon was for a one-year term, the Omaha National Bank in January, 1984, determined to demand payment from Lemon because of perceived violations of the promissory obligation. Omaha National Bank was subsequently paid in full prior to the expiration of the original term of the loan.

Lemon, however, remained obligated to First National Bank in Glidden. Shortly before the loan's maturity date, Bank wrote to Lemon advising him of the amount of the remaining principal balance and accrued interest through the maturity date, and of the terms under which Bank would renew the loan. In order to renew the note, Bank required Lemon's payment of $100,000.00 in principal and $42,000.00 in accrued interest. No agreement for renewal was made, and Lemon defaulted on payment of the note.

In August, 1984, the Bank filed an Iowa state court action against McLaughlin Farms, Inc. (McLAUGHLIN FARMS), Bru–Bet Arabians, Inc., Bruce McLaughlin, John H. McLaughlin and Mary Ann E. McLaughlin (referred to collectively as "the McLAUGHLINS") to recover on guaranties of the Lemon debt. Exhibit 21. It did not seek foreclosure of its security interest in the personal property of McLaughlin Farms or Bru–Bet Arabians, Inc. (BRU–BET). It sought only a money judgment in the amount of $300,000.00 plus interest, attorneys' fees and costs.

The defendants asked the law firm of Kurth & Bunger in Carroll, Iowa to present their defenses. The firm filed counterclaims against Bank which included claims of McLaughlin Farms and/or Bru–Bet Arabians, Inc. These counterclaims involved breach of contract and mishandling of funds.

The parties made attempts to settle the lawsuit but were unsuccessful. On behalf of McLaughlin Farms or Bru–Bet and the individual McLaughlins, attorney Bunger made a settlement offer to the Bank during February of 1985. Exhibit 34. The offer contemplated reduction of the amount due to Bank and payment of the reduced amount over a five-year period. The offer proposed to secure the amount to be paid by the assignment to the Bank of "certain Iowa horse contracts." That offer was rejected by a Bank counteroffer. Exhibit 35, paragraph 1. By January 7, 1986, the Bank believed settlement negotiations had broken down, and it was ready to proceed with discovery and trial. This position was conveyed to McLaughlins' attorney by letter dated January 7, 1986. Exhibit 37. Perhaps before receiving that letter, attorney William Kurth contacted Bank's counsel, William Graham, with an amended settlement proposal. Exhibit 38. The "proposed settlement agreement and release" attached to Kurth's letter to Graham was the result of previous drafting and redrafting. From the evidence, the court cannot determine which party's counsel drafted which portions of that agreement. The agreement contemplated a promissory note from Bru–Bet to the Bank in the amount of $350,000.00 secured by an interest in certain Arabian horses. Under the agreement, Bank was to release Lemon, McLaughlin Farms and the individual McLaughlins from any and all claims. The agreement did not mention Bank's security interest in machinery and equipment, and according to the testimony of John McLaughlin, the subject of farm machinery did not come up in his discussions with his counsel. Bank's counsel rejected the proposed agreement as "dramatically different from the proposal Mr. Dunn had understood you might be forwarding to us...." Exhibit 39. Trial in state court commenced in October, 1986. On the fifth day, the parties again discussed settlement. Agreement was reached on October 29, 1986. At the settlement conference, Sam Scheidler, one of Bank's attorneys, dictated the agreement; it was typed and that evening it was signed. Exhibit 22. Releases were pre-

pared and executed on October 29 and October 31. Exhibits 28, 42, 43, and 41. A release signed by Bank in favor of McLaughlin Farms and Bru–Bet released those parties from "any and all claims ... now held or which might arise in the future resulting from the transactions which are the subject matter of the lawsuit No. 28497 on file in the Iowa District Court for Carroll County." Bank filed a dismissal with prejudice of that lawsuit in November, 1986. Exhibit 23.

McLaughlin Farms, Bru–Bet and the individual McLaughlins failed to deliver the horses to the Bank. On November 17, 1986, McLaughlin Farms filed a voluntary chapter 11 case. Bank filed suit against Bru–Bet and the individual McLaughlins in February, 1987 in Iowa District Court for Carroll County. The plaintiff's claims were based on defendants' breach of the settlement agreement. Bank sought damages for breach of contract. The Bank did not mention the security agreements in the state court action nor did it seek their foreclosure. In October of 1987, the Bank sued Bru–Bet under the Iowa replevin statute for possession of three Arabian horses owned by Lemon.

In August, 1987, Bank filed a proof of claim in the McLaughlin Farms bankruptcy case asserting a claim of $250,850.00. Attachments to the proof of claim included in the breached settlement agreement. The claim was filed as an unsecured claim. The McLaughlin Farms chapter 11 case was converted to a liquidation case on January 29, 1988.[2]

The parties are locked in a dispute as to the effect of the settlement agreement upon the security agreements. More particularly, they dispute the meaning of paragraph 5 of the agreement. Bruce McLaughlin, a former officer and director of McLaughlin Farms, testified that when he executed the settlement agreement, he believed that that was the "end of it," that the McLaughlins and the Bank could no longer bring up anything in the future with

regard to the Meadowlark Lemon transaction. He believed he could not be sued on the guaranties. McLaughlin believed that the Bank's only claims arose out of the settlement agreement itself. McLaughlin, however, gave no specific thought to the effect of the settlement agreement on the security agreements and financing statements. Moreover, John McLaughlin either did not realize or did not recall at the time of the execution of the agreement that the Bank claimed an interest in farm machinery and equipment or other personalty. He does not deny that the original security documents made provision for such a security interest, it was just that he only became conscious of the Bank's interest prior to this bankruptcy litigation. Attorney Kurth testified to his belief that the execution of the settlement agreement extinguished Bank's rights under all previous loan documents. Kurth believed that the settlement agreement was "a complete settlement"—that McLaughlins would no longer have a relationship with the bank except for the requirement that they deliver to it $250,000.00 worth of Arabians horses. Kurth believed that all underlying paperwork had been superseded including the guaranties, security agreements and financing statements. He believed that is what his clients understood. However, Kurth does not recall ever saying to his clients that the Bank's interest in machinery and equipment was or would be released. Instead, he was portraying to his clients a settlement that resolved all matters, leaving only the obligation to deliver horses. The testimony by deposition of Darwin Bunger, McLaughlins' other counsel, was similar. Bunger believed that the relationship between Bank and McLaughlins after the settlement agreement rested solely on the settlement agreement. Bunger testified as to advising Bruce McLaughlin that if there were a "fight" in the future it would be on the basis of the settlement agreement and not on the basis

2. After the conversion of the case, Bank filed claims in each of the titled cases, McLaughlin Farms, Bru–Bet Big Sky and Bru–Bet Arabians, Inc. The court takes judicial notice that such claims were filed on June 22, 1988 as claim nos. 29, 20 and 72, respectively. Each proof of claim alleged it was secured and attached copies of the security agreements relevant to this case.

of "all these documents." The McLaughlins' lawyers, Bunger and Kurth, wanted to eliminate as much documentation as possible as the basis of future lawsuits. However, Bunger, as Kurth, could not testify as to specifically mentioning to any opposing counsel or to his own clients, that the settlement agreement specifically eliminated or extinguished Bank's rights to machinery and equipment. When asked by opposing counsel in his deposition, Bunger testified that his emphasis was as to the future basis for liability, not which particular documents had been extinguished. The following colloquy took place:

Do you ever recall telling any of the clients you've already mentioned that they would be eliminating the security agreement—or rather the security interest of the bank in property such as equipment and farm machinery when they settled the case on October 29, 1986?

Bunger: I don't think that it—that a comment I would have made would have been couched in those terms. It probably was a comment—my commentary probably would have lended itself to the other side of the coin, which would have, all right, with this settlement agreement we have distilled this thing down to an agreement on how we're going to resolve it and this will be the basis of the relationship between the two of you from here forward.

On the other hand, Robert Van Horn, president of the Bank, believed that his security agreements survived the execution of the settlement. His understanding of the agreement was that the bank was "writing down" the amount due and agreeing to take payment in horses to settle the dispute. His understanding of paragraph 5 was that even if the settlement fell apart, he would not be able to seek payment from the defendants as to the written-off portion of the loans.

The farm machinery and equipment had been an important aspect of the Bank's determination to make the loan to Meadowlark Lemon and to accept the McLaughlin guaranties. Omaha National Bank, whose expertise lay in livestock or horse collateral, wanted Arabian horses as security for its portion of the loan. Bank, on the other hand, believed that McLaughlin Farms owned approximately one-half million dollars worth of farm machinery and that along with farm products such collateral satisfied the Bank's credit requirements in making the loan. Van Horn believed that the machinery and equipment would remain as collateral until the Bank received the $250,000.00 worth of horses. Bank has never tried to replevin or foreclose on the machinery and equipment.

## DISCUSSION

The issue before the court, in its simplest terms, is whether the Bank's security agreement outlived the execution of the settlement agreement. The trustee contends that it did not, that the settlement agreement and the obligations thereunder were a substitute for any pre-existing obligations under the security agreements. Bank argues that the settlement agreement did not abolish the security agreements and that the obligations under the settlement agreement were secured by the security agreements pursuant to their "future advance" clauses.

The court agrees with Bank.

## BURDEN OF PROOF

The trustee seeks a determination of the validity of Bank's lien.

The purpose of this case is to determine the rights of the Bank in property of the estate. The law of Iowa governs questions regarding such rights. *Johnson v. First National Bank of Montevideo, Minn.*, 719 F.2d 270, 273 (8th Cir.1983), *cert. denied* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). As a substantive matter, burden of proof is also governed by state law. *Palmer v. Hoffman*, 318 U.S. 109, 117, 63 S.Ct. 477, 482, 87 L.Ed. 645 (1943). The trustee has pled and must rely upon the settlement agreement to support a determination that Bank has no lien in the machinery and equipment which is property of the estate. The burden of proof as to a settlement is on the party alleging the settlement. *Atlantic Veneer*

*Corp. v. Sears*, 232 N.W.2d 499, 504 (Iowa 1975). The trustee has shown that a settlement was made. Such proof raises a presumption that the settlement covered all claims which arose prior to it. The burden of rebutting this presumption is on the party seeking to avoid the evidence of settlement. *Marsh v. Pilcher Hardware Co.*, 190 Iowa 592, 180 N.W. 648, 649 (1920). While the presumption aids the trustee, he retains the burden of proving that the security agreements were extinguished by the settlement agreement. *Barber v. Maden*, 126 Iowa 402 102 N.W.120 (1905). *Rickel v. Kladivo*, 219 N.W. 484, 485 (Iowa 1928).

It is the ultimate burden of the trustee to show that the settlement agreement abolished Bank's security interest in the farm machinery and equipment. Regardless of where the burden might lie, the preponderance of evidence in this case favors a determination that the settlement agreement did not extinguish Bank's security agreements and that debtors' obligations under the settlement agreement were secured by those agreements.

## ACCORD OR SUBSTITUTION/NOVATION CONTRACT?

■ The first question which the court must decide is whether the settlement agreement was an accord between the parties or whether the settlement agreement was a new contract intended by the parties to be a substitute for a previous obligation. Bank had sued the McLaughlin corporate entities (McLaughlin Farms, Inc. and Bru–Bet Arabians, Inc.) and various individual McLaughlins on the basis of guaranties given to support the Meadowlark Lemon promissory notes. No action was taken at that time to enforce the security agreements. Bank was seeking to collect $300,000.00 plus interest and attorneys' fees. It settled for $250,000.00 worth of Arabian horses. If the settlement agreement was an accord, then the McLaughlins' (corpo-

rate entities and individuals) failure to perform the settlement agreement would enable the Bank to sue on the original guaranties and associated obligations. *Sergeant v. Leonard*, 312 N.W.2d 541, 545 (Iowa 1981). If the settlement was a contract which the parties intended to substitute for the existing agreement, then a breach of the settlement agreement does not permit the Bank to enforce the original duty covered by the substitution. *Id.* at 546. Whether the settlement agreement is an accord or a substitute contract is determined by the intention of the parties.[3] *Id.;* See also *In re Hansen*, 85 B.R. 821, 826 (Bankr.N.D.Iowa 1988).

■ The court reads the last sentence of paragraph 5 of the settlement agreement to indicate that the agreement is a substitute contract and not an accord. To the extent that a resort to extrinsic evidence is necessary to support this conclusion, the testimony of Robert Van Horn is most telling. Van Horn understood that if the McLaughlins failed to perform the settlement agreement, he was limited in his claim to $250,000.00 and could no longer collect the balance of the Meadowlark Lemon loan, which at the time of the filing of the suit exceeded $340,000.00.

The difficulty with this case is not in determining that the settlement agreement was a substitute contract, but in determining for what it was to substitute. The court interprets paragraph 5 of the settlement to mean that the guaranties executed by the McLaughlins were nullified by the settlement agreement which took their place. Bank, by the agreement, had substituted the settlement agreement for its rights under the McLaughlin guaranties.

The nub of this dispute, however, is whether the settlement agreement was intended to displace the security agreements. To determine this question, the court's first resort is to the agreement itself. Because paragraph 5 of the agreement is so critical

**3.** Although attorney for the Bank may have dictated the settlement agreement, it was not construed by the court against the Bank because, from the evidence, it is determined that it was prepared with the aid and approval of debtor's counsel. *Kinney v. Capitol–Strauss, Inc.*, 207 N.W.2d 574, 577 (Iowa 1973).

to a determination of this question, it will be quoted again in full:

5. The parties agree to dismiss any and all claims they are making in this action and provide releases to the other party. Each party shall pay their own court costs. Furthermore, the parties agree that any and all claims they now have against the other, their officers, employees, or agents, and any and all claims they might have in the future arising out of each and all the transactions subject of this suit are forever barred. The parties further agree that the claim each may have against the other as to the transactions the subject of this suit shall be founded only in this settlement agreement document.

It is necessary for the court to interpret the meaning of paragraph 5 of the settlement and to construe its legal effect. *See Farm Bureau Mutual Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 107–108 (Iowa 1981). In interpretation, the purpose is to determine the meaning and intention of the parties "as expressed in the language used." *Allen v. Highway Equipment Co.*, 239 N.W.2d 135, 138 (Iowa 1976).

■ To the extent that ambiguity in paragraph 5 is necessary to support the consideration of extrinsic evidence, this court believes that paragraph 5 is ambiguous. *Hamilton v. Wosepka*, 261 Iowa 299, 154 N.W.2d 164, 172 (1967). In paragraph 5, the parties purport to dismiss any and all claims; they agree that any and all claims are "forever barred." They agree that the "only claim" each of the parties may have against the other shall be founded only in the settlement agreement. Are these claims relating only to the McLaughlins' guaranties and to the McLaughlins' counterclaims? Or do these claims also relate to the Bank's rights under the security agreements?

■ Based on the evidence, the court finds that the parties intended the settlement agreement to displace only the obligations of McLaughlins under the two guaranties. Evidence supporting this finding is as follows: The "action" or "suit" referred to in paragraph 5 was the one pending in the Iowa District Court for Carroll County. That suit makes no mention of the security agreements and does not attempt to foreclose them. It was a suit on the guaranties only. The settlement discussions between the parties made no specific reference of the Bank's security interest in McLaughlin Farm's machinery and equipment, and no specific mention was made in the discussions or in the settlement agreement about the release of the security. When Omaha National Bank was paid in full, Bank took care in providing partial UCC releases to retain its security interest in machinery and equipment. John McLaughlin, a shareholder and officer of McLaughlin Farms, Inc. gave no thought to the Bank's interest in machinery and equipment during the course of the settlement negotiations. McLaughlin understood that a purpose of the settlement agreement was to provide a new basis of obligation to Bank; he had not discussed with counsel nor given personal thought to the Bank's security interest.

There is no evidence that the suit between McLaughlins and Bank involved any dispute over Bank's security interest in machinery and equipment. The evidence indicated disputes between McLaughlins and Bank about whether the note or guaranties were due, about the Bank's alleged mishandling of funds, and as to whether Bank had a claim against Mary Ann E. McLaughlin.

It is true that the lawyers contemplated that if there were future disputes, they would be based on the settlement agreement and not the multitude of documents which they had previously had to deal with in the litigation. There is no evidence, however, that the attorneys were ever involved in a dispute over the security agreements or that they ever discussed with their clients the extinguishment of those agreements. Moreover, it would make no sense, based on the evidence, for the Bank to release its security agreements while it waited 60 days for the delivery of horses, only three of which were pledged to it as collateral.

The court might have reached a different conclusion if the validity of the security agreements had been the subject of a dispute between the parties. Had it been, one would think that shortly after the execution of the settlement agreement and the dismissal of the state court proceeding, McLaughlins would have demanded the releases of the UCC financing statements.

 Finally, the court does not believe it detrimental to the Bank that it failed to seek foreclosure on the machinery and equipment in either its original petition in state court, Exhibit 21, or in its post-bankruptcy suit against the then, non-bankruptcy parties to the settlement agreement. Exhibit 27. There is no requirement under Iowa law that the creditor join a foreclosure on collateral with an action on the underlying claim. Iowa Code § 554.9501(1) and (5). *See e.g., Hill v. Bank of Colorado,* 648 F.2d 1282, 1286 (10th Cir.1981); *Ceres Fertilizer, Inc.,* 209 Neb. 447, 308 N.W.2d 347, 349 (1981); *Rural Gas, Inc. v. Shepek,* 205 Kan. 397, 469 P.2d 341 (1970).

Thus, this court interprets the settlement agreement, so far as Bank's claims are concerned, as precluding further action by the Bank on the guaranties. It did not, however, deal with or contemplate dealing with the security agreements.

IS THE OBLIGATION OF McLAUGHLIN FARMS, INC. UNDER THE SETTLEMENT AGREEMENT SECURED BY ITS MACHINERY AND EQUIPMENT?

 The final question to be resolved is whether the security agreements were intended to secure the later settlement agreement. This is a matter of the intent of the parties at the time the original security agreements were executed. *Onawa State Bank v. Simpson (Matter of Estate of Simpson),* 403 N.W.2d 791, 792 (Iowa 1987). In seeking the parties' intent, the court may look to the language of the security agreement and also to whether the later settlement agreement is related to or is within the same class as the original debt so as to permit the inference "that it was covered by the earlier agreement...." *Id.*

at 793. The relationship between the original guaranties and the subsequent settlement agreement is not difficult to discern in this case. It is the same debt, compromised. Bank originally loaned money to Meadowlark Lemon to permit his purchase of Arabian horses from McLaughlin Farms. To enable the loan, McLaughlin Farms and the individual McLaughlins executed guaranties to Bank secured by corporate property. After Lemon defaulted on the note and the debt went unpaid, litigation ensued leading to the settlement agreement which compromised McLaughlins' obligations under the guaranties.

 Bank takes the position that the settlement agreement was secured by the security agreements by operation of the latters' paragraphs 4—the "future advance" clause. The scope of paragraph 4, at the time of its execution, included the guaranties.

The pertinent portion of paragraph 4 is as follows:

[T]he security interest granted herein is given to secure ... the payment of the indebtedness evidenced by the promissory note(s) or other instruments executed by Debtor to the order of Bank and any other indebtedness of Debtor to Bank, whether now existing or hereafter incurred, or every kind and character, direct or indirect, whether as maker, endorser, guarantor or surety and whether such indebtedness is from time to time reduced and thereafter increased or entirely extinguished and thereafter reincurred.

Such clauses are permitted under Iowa Code § 554.9204(5), which provides that "obligations covered by a security agreement may include ... other value...." Bank's agreement to settle was such "other value."

 It is not detrimental to Bank's argument that the prior secured obligations, the guaranties, were extinguished by the settlement agreement. That does not mean that the security agreements themselves cease to exist. *City Bank, N.A. v. Halpert (In re Lawrence Peska Associa-*

*tions, Inc.),* 27 UCC Rep.Ser. (Callaghan) 272, 277 (S.D.N.Y. Mar. 22, 1979), *contra Chadron Energy Corp. v. First National Bank of Omaha,* 221 Neb. 590, 379 N.W.2d 742, 750 (1986).

 The court believes that paragraph 4 was sufficiently broad enough to include the substitute contract or novation agreement later executed. It is reasonable that the parties, in executing the security agreements, would have believed that future renewals or later compromises would have continued to be secured by the security interest so granted. It might be otherwise had there been a dispute over the efficacy or coverage of the original security agreement. However, there is no evidence of that. The court finds it was the intent of the parties at the time of the execution of the original security agreements to include within their coverage future compromises of the underlying debt obligations. The court, therefore, finds and concludes that the settlement agreement executed by the parties on October 29, 1986 was secured by the security agreements of July 14, 1983.

## CONCLUSIONS OF LAW

First National Bank of Glidden has a valid and perfected security interest in the farm machinery and equipment of McLaughlin Farms, Inc. including Bru–Bet Arabians. Bank's security interest in such property of the bankruptcy estate is prior to any interest of the trustee under 11 U.S.C. § 544(a). Iowa Code § 554.9312(5)(a).

## ORDER

IT IS ORDERED that judgment shall enter that First National Bank, Glidden, Iowa is determined to have a valid and perfected security interest in estate farm machinery and equipment and the proceeds thereof.

IT IS FURTHER ORDERED that the trustee shall have 20 days after judgment

becomes final to file any desired motion under 11 U.S.C. § 506(c).

SO ORDERED.